**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**JALISHA VANDIVER**                                                             **PLAINTIFF**

**v.**                               **CASE NO. 4:03-CV-00834 GTE**

**LITTLE ROCK SCHOOL DISTRICT;**
**VERNON SMITH, JR., individually and in**
**his official capacity as Principal of Hall High**
**School; MARIAN LACEY, individually and in**
**her official capacity as Assistant Superintendent of**
**Secondary Education of Little Rock School District**                **DEFENDANTS**

<u>**ORDER**</u>

Presently before the Court is Defendants' Motion for Summary Judgment.

**I. Background**

Plaintiff came to work at the Little Rock School District ("LRSD") in August of 2002.[1]

Vernon Smith, the Principal of Hall High at the time, hired her as a long-term substitute teaching

ninth and tenth grade English at Hall High School.[2]  Approximately one month later, she was

hired as a full-time teacher at Hall High.[3]  Her last day at work was December 9, 2002.  She

resigned effective February 27, 2003 pursuant to a February 26, 2003, agreement with the LRSD.

Plaintiff testified that approximately two weeks after her date of hire, Defendant Smith

began making unsolicited and unwelcome sexual advances, requests for sexual favors, and other

---

[1]Exhibit 1, Vandiver Dep. p. 6, Defendants' Motion for Summary Judgment ("Defendants' Motion").

[2]Exhibit 1, Vandiver Dep. p. 6, Defendants' Motion.

[3]Exhibit 1, Vandiver Dep. p. 10, Defendants' Motion.

verbal and physical conduct of a sexual nature to her.[4]  She states that Defendant Smith's

inappropriate remarks and conduct continued on a very regular basis throughout her

employment.[5]  Plaintiff alleges that Defendant Smith asked her to perform oral sex on him as

payment for giving her the job, informed her that he wanted to have sexual intercourse with her

in his office, and told her that he could have sexual intercourse with her in the classroom and no

one would care.[6]  Plaintiff asserts that she reported the sexual harassment to Marian Lacey,

Assistant Superintendent of Secondary Education of the LRSD in mid-November 2002.[7]

According to Plaintiff, after she told Dr. Lacey that Defendant Smith threatened her job if she did

not perform sexual acts, Dr. Lacey stated that she "would take care of it" and "it would never

happen again."[8]  Plaintiff also asserts that she spoke with other teachers at Hall High School who

informed her that Separate Defendant Smith made sexually inappropriate comments to them as

well.[9]

---

[4]Exhibit 1, Vandiver Dep. p. 12, Plaintiff's Response to Defendants' Motion ("Plaintiff's Response").

[5]Exhibit 1, Vandiver Dep. p. 14, 19, 20, 22, 24, 27-29, 46-50, 56-59, 71, 97, 128, 160, Plaintiff's Response.

[6]Exhibit 1, Vandiver Dep. p. 27, 29, 56-57, Plaintiff's Response.

[7]Exhibit 1, Vandiver Dep. p. 23, Plaintiff's Response.

[8]Exhibit 1, Vandiver Dep. p. 23-24, Plaintiff's Response.

[9]Exhibit 1, Vandiver Dep. p. 62-65, Plaintiff's Response.

Plaintiff admits that she squirted two students with a water bottle during class on November 11, 2002.[10]  Plaintiff left school on November 11, 2002, and went to the hospital.[11] She was cleared to return to work on November 25, 2002, but had to go home.[12]  After Thanksgiving break, she returned for her first full week back during the first week of December.[13]  Plaintiff admits to squirting two students with a water bottle during class in a statement dated December 1, 2002.[14]  In a statement dated December 3, 2002, Plaintiff admits that she used profanity toward her students on more than one occasion.[15]  Specifically, she told one student to "sit your ass down and shut your face," another student to "sit your ass down," and another student to "sit your ass down, shut your face, and read."[16]  Plaintiff admitted that she had been informed that the use of profanity violated district policy.[17]

However, Plaintiff asserts that she wrote the two statements discussed above at the direction of Defendant Smith under duress, but she admits the truthfulness of those statements.

---

[10]Exhibit 1, Vandiver Dep. p. 80, Defendants' Motion; Exhibit 2, Vandiver Statement 1, Defendants' Motion.

[11]Exhibit 1, Vandiver Dep. p. 51, Defendants' Motion.

[12]Exhibit 1, Vandiver Dep. p. 51, Defendants' Motion.

[13]Exhibit 1, Vandiver Dep. p. 51-52, Defendants' Motion.

[14]Exhibit 1, Vandiver Dep. p. 80, Defendants' Motion; Exhibit 2, Vandiver Statement 1, Defendants' Motion.

[15]Exhibit 1, Vandiver Dep. p. 96, Defendants' Motion; Exhibit 3, Vandiver Statement 2, Defendants' Motion.

[16]Exhibit 3, Vandiver Statement 2, Defendants' Motion.

[17]Exhibit 1, Vandiver Dep. p. 101, Defendants' Motion; Exhibit 3, Vandiver Statement 2, Defendants' Motion.

Plaintiff also disputes Defendant Smith's interpretation of the definition of "profanity." Additionally, Plaintiff states that she was suffering from Post Traumatic Stress Disorder at the time she squirted the students with water and made the comments at issue to her students.[18]

Plaintiff asserts that on or about December 2, 2002, she made a written complaint to Chris Heller, attorney for the LRSD, concerning the sexually harassing conduct being perpetrated by Separate Defendant Smith.[19]  She also asserts that she sent a letter to Separate Defendant Smith on or about December 4, 2002, stating that his behavior was affecting her job and asking him to stop.[20]

On December 5, 2002, Plaintiff reported to Defendant Smith's office for a disciplinary meeting.[21]  Plaintiff asserts that Separate Defendant Smith informed her that she did not have to be terminated if she would "just pay up," but she refused.[22]  Although Georgia Walton was initially present at the meeting as a union representative, she left after Plaintiff stated that she was not in the union and that Ms. Walton was not her representative.[23]  Defendant Smith called Beverly Williams, LRSD's Director of Human Resources, who informed Plaintiff that the District would allow her to resign for personal reasons.[24]  Plaintiff was given a resignation form

---

[18]Exhibit 3, Medical Report, Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response").

[19]Exhibit 1, Vandiver Dep. p. 42-43, Plaintiff's Response.

[20]Exhibit 1, Vandiver Dep. p. 43, Plaintiff's Response.

[21]Exhibit 1, Vandiver Dep. p. 104, Defendants' Motion.

[22]Exhibit 1, Vandiver Dep. p.127-28, Plaintiff's Response.

[23]Exhibit 1, Vandiver Dep. p. 104-05, Defendants' Motion.

[24]Exhibit 1, Vandiver Dep. p. 105, Defendants' Motion.

and told to return it whether or not she signed it.[25]  The last day Plaintiff reported to work at Hall High School was December 9, 2002.[26]

On or around December 10, 2002, Plaintiff returned for a meeting with Defendant Smith, Judy Zink and Ken Moore.[27]  Plaintiff informed Mr. Smith that she flushed the resignation form down the toilet because that is what you do "with shit."[28]  Plaintiff was given a letter signed by Defendant Smith, which Plaintiff tore up.[29]  Plaintiff was sent the letter dated December 10, 2002, signed by Dr. James, Superintendent of Schools for the Little Rock School District, stating his reasons for the recommendation of termination.[30]  Specifically, Dr. James states, "Upon the recommendation of . . . Mr. Vernon Smith, and in compliance with the terms of the Arkansas Teacher Fair Dismissal Act, I am notifying you that I will recommend to the Board of Directors that your teaching contract with the Little Rock School District be terminated."[31]  He further states, "My recommendation is based on the fact that you exhibited unprofessional conduct."[32] Dr. James specifically references Plaintiff's actions in "squirt[ing] water on students and cursed students" and her "behavior in the conference with [her] principal on December 10, 2002,

---

[25]Exhibit 1, Vandiver Dep. p. 105, Defendants' Motion.

[26]Exhibit 1, Vandiver Dep. p. 52, Defendants' Motion.

[27]Exhibit 1, Vandiver Dep. p. 110, Defendants' Motion.

[28]Exhibit 1, Vandiver Dep. p. 110, Defendants' Motion.

[29]Exhibit 1, Vandiver Dep. p. 110-11, Defendants' Motion.

[30]Exhibit 7, James Letter, Defendants' Motion.

[31]Exhibit 7, James Letter, Defendants' Motion.

[32]Exhibit 7, James Letter, Defendants' Motion.

including, but not limited to where [she] tore up [her] letter from him."[33]   Plaintiff admits that the reasons stated in the letter from Dr. James are true.[34]

Plaintiff returned to Hall High on January 10 and 13, but was asked to leave, and on January 13, she was escorted off campus.[35]   Plaintiff admits that on January 14, 2003, she called Ken Moore, Assistant Principal, and told him that she had a gun, was "going to come up to the school," and "kill Mr. Smith."[36]   She admits that she told Mr. Moore that she "was going to have [her] students do a Columbine."[37]   In her deposition, Plaintiff states that Mr. Moore's statement is "completely true."[38]   The statement by Ken Moore, dated January 14, 2003, states:

> On Tuesday, January 14, 2003, Ms. J. Vandiver called me and said that she was going to kill Mr. Smith and that her students were going to do to Hall what the kids did at Columbine, but only worse.  She said that she was sick and that she would do anything.  Also, she has visions about the mass murder at Hall.
>
> I told Ms. Vandiver that I would have to report this matter to the police and that I was not happy that she had put me in the middle of her mess.  She said, that was why she told me, because she knew that I would stop her before she did something that she did not want to do.[39]

---

[33]Exhibit 7, James Letter, Defendants' Motion.

[34]Exhibit 1, Vandiver Dep. p. 126, Defendants' Motion.

[35]Exhibit 1, Vandiver Dep. p. 113, Defendants' Motion.

[36]Exhibit 1, Vandiver Dep. p. 120-21, Defendants' Motion.

[37]Exhibit 1, Vandiver Dep. p. 121, Defendants' Motion.

[38]Exhibit 1, Vandiver Dep. p. 122, Defendants' Motion.

[39]Exhibit 4, Moore Statement, Defendants' Motion.

In a letter dated January 15, 2003, Plaintiff was informed that she had been suspended.[40]

In a letter dated February 13, 2003, Dr. James informed Plaintiff that he would recommend

termination based upon her phone call to Mr. Moore on January 14, 2003, where she threatened

to kill Mr. Smith and threatened that her students "were going to do to Hall what the kids did at

Columbine."[41]  Plaintiff admits that the reasons stated in the second letter from Dr. James are

also true.[42]  Plaintiff states that she was suffering from Post Traumatic Stress Disorder at the time

she made this phone call.[43]

On or about February 24, 2003, Plaintiff's attorney, John Myers and LRSD attorney Chris

Heller began communicating about the terms of Plaintiff's resignation.[44]  An e-mail from Mr.

Heller to Mr. Myers dated February 26, 2003, states:

> I'M WRITING TO CONFIRM OUR AGREEMENT TO RESOLVE THE
> ISSUES WHICH OTHERWISE WOULD HAVE BEEN PRESENTED TO THE
> LRSD BOARD OF DIRECTORS AT A HEARING TOMORROW.  MS.
> VANDIVER HAS AGREED TO RESIGN HER POSITION WITH LRSD AND
> WILL SUBMIT AS SOON AS POSSIBLE TO BOARD PRESIDENT JUDY
> MAGNESS AND SUPERINTENDENT DR. KEN JAMES A LETTER OF
> RESIGNATION EFFECTIVE February 27, 2003.  LRSD AGREES TO
> CONTINUE HER SALARY FOR ONE MONTH BEYOND February 27, TO
> CONTINUE HER BENEFITS THROUGH THE END OF HER CURRENT
> CONTRACT (AS A PRACTICAL MATTER, June 30, 2003) AND TO
> PROVIDE HER A NEUTRAL REFERENCE (JOB TITLE AND DATES OF

---

[40]Exhibit 1, Vandiver Dep. p. 113, Defendants' Motion.

[41]Exhibit 8, James Letter 2, Defendants' Motion.

[42]Exhibit 1, Vandiver Dep. p. 126, Defendants' Motion.

[43]Exhibit 3, Medical Report, Plaintiff's Response.

[44]Exhibit 1, Vandiver Dep. p.131, Plaintiff's Response.

EMPLOYMENT).  PLEASE CONFIRM THIS AGREEMENT BY RETURN E-MAIL.  THA[]NKS FOR YOUR COOPERATION.[45]

Mr. Myers responded:

> Your e-mail (February 26, 2003 11:07 AM) fairly sets out the terms of our agreement.  Let me know if there is anything else that Ms. Vandiver needs to do to implement the agreement.  She will be in my office to sign the resignation form as soon as the roads thaw.[46]

A letter from Mr. Myers to Mr. Heller, dated March 5, 2003, states in pertinent part:

> Enclosed please find M[s]. Vandiver[’s] resignation effective Thursday February 27, 2003 made pursuant to our February 26, 2003 agreement.  To reiterate, for personal reasons M[s]. Vandiver has agreed to resign from her teaching position with LRSD; she will be paid through March, 2003; she will remain on the LRSD insurance plan through the end of her current contract (June 30, 2003) and any job related reference will be neutral, stating only her dates of employment and that she resigned.[47]

Plaintiff asserts that she did not know anything about the agreements between the lawyers for her to resign in exchange for a continuation of salary and benefits.[48]  Plaintiff resigned effective on February 27, 2003.[49]  Plaintiff received her salary for a month beyond her resignation date and

---

[45]Exhibit 2, Attorney Communications, Plaintiff's Response.

[46]Exhibit 2, Attorney Communications, Plaintiff's Response.

[47]Exhibit 2, Attorney Communications, Plaintiff's Response.

[48]Exhibit 1, Vandiver Dep. p.136, Plaintiff's Response.

[49]Exhibit 11, Resignation Letter, Defendants' Motion.

benefits through the end of her contract.[50]  Plaintiff filed for bankruptcy on June 18, 2003.[51]  She

did not list her claims against the Defendants as an asset in her bankruptcy forms.[52]

On July 24, 2003, Plaintiff filed her Charge of Discrimination with the EEOC.[53]  She

received her right-to-sue letter on July 28, 2003.[54]  Plaintiff did not amend her bankruptcy

petition to reflect her claims against the Defendants.[55]  Plaintiff received a discharge in her

bankruptcy on September 30, 2003.[56]  Plaintiff's bankruptcy case was closed on October 6,

2003.[57]  Plaintiff filed her Complaint on October 21, 2003.  Plaintiff filed her Amended

Complaint on April 2, 2004.  Plaintiff reopened her bankruptcy as of April 16, 2007, to amend

her Chapter 7 Bankruptcy petition and schedules to reflect this action.[58]

## II.  Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

---

[50]Exhibit 9, Agreement e-mail, Defendants' Motion; Exhibit 10, Cover Letter to Resignation Letter, Defendants' Motion; Exhibit 1, Vandiver Dep. p. 133, Defendants' Motion..

[51]Exhibit 1, Vandiver Dep. p. 140-41, Defendants' Motion; Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[52]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[53]Exhibit 13, EEOC Documents, Defendants' Motion.

[54]Exhibit 13, EEOC Documents, Defendants' Motion.

[55]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[56]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[57]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[58]Exhibit 6, Order Reopening Bankruptcy, Plaintiff's Response.

dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,'that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his

pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III.  Motion for Summary Judgment

Defendants argue that they are entitled to judgment as a matter of law for the following reasons: (1) this action is barred by Plaintiff's failure to list her claims against these Defendants as an asset in her bankruptcy; (2) this action is barred by Plaintiff's previous settlement and compromise of her claims; (3) this action is barred because Plaintiff failed to file a timely EEOC charge; (4) there were legitimate, non-discriminatory reasons for recommending Plaintiff's termination and accepting her resignation; and (5) Plaintiff does not have a private right of action under Title IX.

There are other serious issues suggested by the record which have not been adequately raised or briefed, to wit:  As to Plaintiff's Title VII claims, Defendants have not argued that Plaintiff has failed to establish her prima facie case, or that they are entitled to the *Ellerth* affirmative defense.  Rather, in their Motion for Summary Judgment, Defendants argue, under the *McDonnell Douglas* standard, that they have demonstrated a legitimate, nondiscriminatory reason for recommending her termination, and Plaintiff has failed to demonstrate that the proffered reason is pretextual.  However, as stated below, the *McDonnell Douglas* standard does not apply to claims of quid pro quo harassment and hostile work environment.

11

Nonetheless, the Court expresses its concern regarding the ability of Plaintiff to establish the fourth element of her prima facie case of quid pro quo harassment, which would requires her to demonstrate that her refusal to submit *resulted* in a tangible job detriment.  Furthermore, the determination of whether there is evidence that Plaintiff's resignation was causally related to the alleged sexual harassment in regard to the quid pro quo harassment claim could determine whether Plaintiff's Title VII hostile work environment claim is time-barred.

Additionally, the Court questions whether Plaintiff can present evidence that Defendant Smith possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer, or that Defendant Smith had influence or leverage over the official decisionmaker, such that it would be proper to impute his discriminatory attitudes to the formal decisionmaker, or that Dr. James merely acted as a rubber stamp or the cat's paw for Defendant Smith.  The Court also questions what impact, if any, Plaintiff's claim of Post Traumatic Stress Disorder ("PTSD") has in this case.  Finally, in their motion, Defendants have not addressed Plaintiff's claims pursuant to § 1983 or Plaintiff's parallel cause of action under the Arkansas Civil Rights Act, or Plaintiff's claim of intentional infliction of emotional distress.

### A.  Judicial Estoppel

First, the Court will address Defendants' argument that Plaintiff is barred as a matter of law by the doctrine of judicial estoppel from asserting her claims against them.  Specifically, Defendants argue that Plaintiff's claims should be barred because she did not disclose her claims against the Defendants in her bankruptcy petition and that she failed to amend her bankruptcy petition to reflect her claims against the Defendants upon receipt of her right to sue letter.

The Eighth Circuit recently addressed this issue in the bankruptcy context in *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006), stating:

> The doctrine of judicial estoppel "protects the integrity of the judicial process." *Total Petroleum, Inc. v. Davis,* 822 F.2d 734, 738 n. 6 (8th Cir. 1987). A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court. *Id.* "Judicial estoppel prevents a person who states facts under oath during the course of a trial from denying those facts in a second suit, even though the parties in the second suit may not be the same as those in the first." *Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.,* 4 F.3d 605, 609 (8th Cir. 1993). Therefore, a party that takes a certain position in a legal proceeding, "and succeeds in maintaining that position," is prohibited from thereafter assuming a contrary position "simply because his interests have changed," especially if doing so prejudices the party "who acquiesced in the position formerly taken by him." *New Hampshire,* 532 U.S. at 748, 121 S. Ct. 1808 (internal quotations and citations omitted).

The court discussed the three *New Hampshire* factors to aid it in determining whether to apply the doctrine. *Id*.

"First, a party's later position must be clearly inconsistent with its earlier position." *Id*. "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id*. "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity." *Id*. "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*.

"In the bankruptcy context, a party may be judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements." *Id*. (citing *In re Coastal Plains, Inc.,* 179 F.3d 197, 208 (5th Cir. 1999)).

"A debtor's failure to list a claim in the 'mandatory bankruptcy filings is tantamount to a representation that no such claim existed.'" *Id*. (citing *In re Superior Crewboats, Inc.,* 374 F.3d 330, 335 (5th Cir. 2004)).

"The second *New Hampshire* factor requires that the bankruptcy court have adopted the debtor's position," *i.e.*, by issuing a "no asset" discharge. *Id*. at 1048 (citing *Superior,* 374 F.3d at 335). The court explained that "when a bankruptcy court discharges the debtor's debts based on information the debtor provided in the schedules but thereafter vacates and dismisses the debtor's bankruptcy after learning that the debtor was concealing claims, the court's original discharge of the debt is sufficient acceptance of the debtor's position to provide a basis for judicial estoppel." *Id*. (citing *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 784 (9th Cir. 2001)).

"Under the final *New Hampshire* factor, the debtor's non-disclosure of the claim must not be inadvertent and must result in the debtor gaining an unfair advantage." *Id*. (citing *Superior,* 374 F.3d at 335-36). "A debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." *Stallings,* 447 F.3d at 1048 (citing *In re Coastal Plains, Inc.,* 179 F.3d 197, 210 (5th Cir.1999)). The court explained that "a debtor who files his bankruptcy petition, subsequently receives a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), and then fails to amend his bankruptcy petition to add his lawsuit against his employer as a potential asset is estopped from bringing the lawsuit because the debtor 'knew about the undisclosed claims and had a motive to conceal them from the bankruptcy court.'" *Id*. (citing *DeLeon v. Comcar Indus., Inc.,* 321 F.3d 1289, 1291 (11th Cir. 2003)).

"Notably, judicial estoppel does not apply when a debtor's 'prior position was taken because of a good-faith mistake rather than as part of a scheme to mislead the court.'" *Stallings,* 447 F.3d at 1049 (citing *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir.1996)). "'Although it may generally be reasonable to assume that a debtor who fails to disclose a substantial asset in bankruptcy proceedings gains an advantage,' the specific facts of a case may weigh against such an inference." *Id.* "A rule that the 'requisite intent for judicial estoppel can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding [would] unduly expand the reach of judicial estoppel in post-bankruptcy proceedings and would inevitably result in the preclusion of viable claims on the basis of inadvertent or good-faith inconsistencies.'" *Id.* "Careless or inadvertent disclosures are not the equivalent of deliberate manipulation." *Id.* "Courts should only apply the doctrine as an extraordinary remedy when a party's inconsistent behavior will result in a miscarriage of justice." *Id.*

In *Stallings*, the Eighth Circuit reversed the district court's dismissal of plaintiff's claims based on judicial estoppel. 447 F.3d at 1049. While the first factor was met due to the plaintiff's failure to amend his bankruptcy schedules to include his claims, the court held that the second factor was not met because the bankruptcy court never discharged the plaintiff's debts. *Id.* "Instead the bankruptcy court granted the bankruptcy trustee's motion to dismiss the case." *Id.* The court further held that the third factor was not met because the plaintiff would not derive an unfair advantage over the defendants if he were allowed to bring his claims against them. *Id.* The court noted that the plaintiff was already a Chapter 13 debtor when he was terminated, and thus, could not have known at the time he filed his bankruptcy petition to disclose such claims. *Id.*

The court also noted that unlike the debtors in *Payless Wholesale Distrib., Inc. v. Alberto Culver, Inc.*, 989 F.2d 579 (1st Cir. 1993) and *Barger v. City of Cartersville*, 348 F.3d 1289 (11th Cir. 2003), the plaintiff did not allege that the defendants' wrongdoing caused him to file for bankruptcy. *Id.* The court further held that unlike the debtors in *In re Coastal Plains*, Inc., 179 F.3d 197 (5th Cir. 1999) and *Oneida Motor Frieght, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988), where the plaintiffs brought claims against creditors that were involved in their bankruptcy, thereby seeking to gain a substantial advantage over them by subsequently bringing suits against them after their debts were discharged, the defendants were not creditors of the plaintiff. *Id.* Finally, the court distinguished *De Leon v. Comcar Indus. Inc.*, 321 F.3d 1289 (11th Cir. 2003), in which the debtor was issued a right-to-sue letter by the EEOC after filing for bankruptcy, by noting that the plaintiff received an adverse ruling by the United States Department of Labor, which found that the plaintiff was properly terminated for fraudulently taking leave. *Id.* Thus, the court could not say that the plaintiff clearly knew at the time his bankruptcy was pending that he had a viable claim against the defendants. *Id.*

Here, the first *Stallings* factor is satisfied. Plaintiff failed to list her claims in her bankruptcy proceedings. While the fact that the bankruptcy court granted Plaintiff a discharge without notice of her claims against Defendants arguably creates the appearance that the bankruptcy court was misled, on April 16, 2007, Plaintiff reopened her Chapter 7 case to amend her petition and schedules to reflect this action.[59] Accordingly, the Court cannot find that either the bankruptcy court or this Court is being misled. *See Francis v. Arkansas Blue Cross and Blue Shield*, 2007 WL 1965393, *2 (July 2, 2007). Finally, the Court cannot find that Plaintiff will

---

[59]Exhibit 6, Order Reopening Bankruptcy, Plaintiff's Response.

derive an unfair advantage over Defendants if she is allowed to proceed with her employment

discrimination claims.  Plaintiff asserts that her failure to amend her petition was not an attempt

to manipulate the judicial system.  Rather, she simply did not realize that when considering a

claim against LRSD, she needed to notify the bankruptcy court.  The bankruptcy court has now

been advised of this lawsuit, albeit after the fact.  Furthermore, as in *Stallings*, there are no

allegations that Defendants wrongdoing caused Plaintiff to file for bankruptcy or that they were

her creditors.  *See Tiller v. Fluker*, 2007 WL 1488150, *7 (E.D. Ark. May 17, 2007) (denying

summary judgment on the basis of estoppel on the same basis).

The Court emphasizes that the Eighth Circuit has instructed, "Courts should only apply

the doctrine as an extraordinary remedy when a party's inconsistent behavior will result in a

miscarriage of justice."  *Stallings*, 447 F.3d at 1049.  The Court finds the doctrine of judicial

estoppel is not appropriate in this case.

### B.  Settlement

The law favors the amicable settlement of controversies, and it is the duty of
courts rather to encourage than to discourage parties in resorting to compromise as
a mode of adjusting conflicting claims. The nature or extent of the rights of each
should not be too nicely scrutinized. Courts should, and do, so far as they can do
so legally and properly, support agreements which have for their object the
amicable settlement of doubtful rights by parties; the consideration for such
agreements is not only valuable, but highly meritorious. Because they promote
peace, voluntary settlements of differences between parties having legal capacity
to contract in respect of their rights, where all have the same knowledge or means
of obtaining knowledge concerning the circumstances involving their rights and
where there are no fraud, misrepresentations, concealments, or other misleading
incidents, must stand and be enforced if intended by the parties to be final,
notwithstanding the settlement made might not be that which the court would
have decreed if the controversy had been brought before it for decision. Such
agreements are binding without regard to which party gets the best of the bargain
or whether all the gain is in fact on one side and all the sacrifice on the other.

*Ragland v. Davis,* 301 Ark. 102, 106-07, 782 S.W.2d 560, 562 (1990) (citing *Burke v. Downing*

*Co.*, 198 Ark. 405, 129 S.W.2d 946 (1939) (quoting 11 Am.Jur., *Compromise and Settlement* § 4

(1937))).

> A valid compromise and settlement operates as a merger of, and bars all right to
> recover on, the antecedent claim or right of action included therein. The
> compromise agreement is substituted for the antecedent claim or right, and the
> rights and liabilities of the parties are measured and limited by the terms of the
> agreement. The antecedent claim is extinguished, and subsequent litigation based
> on it is barred by the compromise and settlement. If more than one remedy or
> theory of liability is initially available for the antecedent claim, and if one remedy
> or theory is pursued and results in a compromise and settlement, there is a binding
> election of remedies, and a subsequent action designed to obtain relief for the
> same claim is barred, even if it is based upon a different theory.

*Marshall v. Shelter Ins. Cos.*, 65 Ark. App. 255, 258, 986 S.W.2d 139, 140 (1999) (quoting 15A

Am. Jur. 2d *Compromise and Settlement* § 24 (1976)).

"A district court has the inherent power to summarily enforce a settlement agreement as a

matter of law when the terms of the agreement are clear and unambiguous." *Gatz v. Southwest*

*Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir. 1988). "The district court must hold an

evidentiary hearing, however, when there is a substantial factual dispute concerning the existence

or terms of the settlement agreement, or when the situation presents complex factual issues." *Id.*

(internal citations omitted).

The Eighth Circuit has never determined whether federal or state law governs the

enforcement of a Title VII settlement agreement. *Harris v. Brownlee*, 477 F.3d 1043, 1047 n.2

(8th Cir. 2007). However, it has been noted that the Supreme Court has established that an

employee must knowingly and voluntarily consent to a settlement agreement under which she

waives her right to pursue a Title VII action. *See Fulgence v. J. Ray McDermott & Co.*, 662 F.2d

1207, 1208-09 (5th Cir. 1981) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15,

94 S.Ct. 1011, 1021 n.15, 29 L.Ed.2d 147 (1974)).  The Seventh Circuit has held that whether a

Title VII settlement is knowing and voluntary is a question of federal law.  *Dillard v. Starcon*

*Intern., Inc*. 483 F.3d 502, 507 n.4 (7th Cir. 2007).  The court has also held that the federal law

"knowing and voluntary" requirement "in the employment discrimination context is a

prerequisite to be satisfied after the existence of a binding agreement under state contract

principles has been established."  *Dillard*, 483 F.3d at 507 n.4.

 "Settlement agreements are governed by basic principles of contract law."  *MIF Realty*

*L.P. v. Rochester Assoc.*, 92 F.3d 752, 756 (8th Cir. 1996).  The essential elements of a contract

are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and

(5) mutual obligations.  *Williamson v. Sanofi Winthrop Pharm., Inc*., 347 Ark. 89, 98, 60 S.W.3d

428, 433 (2001).  "[A] court cannot make a contract for the parties but can only construe and

enforce the contract that they have made; and if there is no meeting of the minds, there is no

contract."  *Id*.  "[I]n order to make a contract there must be a meeting of the minds as to all terms,

using objective indicators."  *Id*.  The Court must employ an objective test for determining mutual

assent.  *Ward v. Williams* 354 Ark. 168, 180, 118 S.W.3d 513, 520 (2003).

 Defendants argue that Plaintiff has not challenged the assertion that Mr. Myers had

apparent, if not actual, authority to act on her behalf in this matter.  Defendants also argue that

Plaintiff did not address Defendants' argument regarding the merger of Plaintiff's claims,

including future claims, into her settlement with LRSD with respect to her employment.

 Plaintiff argues that there was no meeting of the minds because she did not know there

were discussions of settlement occurring.  Plaintiff states that she believed LRSD continued her

salary and benefits because "I figured the district knew they had screwed up.  I think they were

trying -- your clients were hoping that maybe they could make me happy, and I would go away."[60]  Plaintiff argues that she only knew that she was agreeing to sign the standard LRSD resignation form stating she was resigning for personal reasons, and she never saw nor discussed any other agreement.  Thus, Plaintiff concludes that there could be no settlement since it was not in her mind to settle anything.  Additionally, Plaintiff states that there was no express manifestation by either party that the Plaintiff would be settling any future claims, and therefore, there was not mutuality of agreement barring the current claim.

Here, Defendants rely on the written communications between their counsel and Plaintiff's former counsel.  In referencing the terms of the agreement, Defendants' counsel states that the agreement is to "resolve the issues which otherwise would have been presented to the LRSD Board of Directors at a hearing tomorrow."  From the record currently before the Court, it does not appear that the "issues" that would have been presented to the LRSD Board would have included anything more than the factual bases for the recommendations by Dr. James that Plaintiff be terminated from her teaching position.  Plaintiff's claims of sexual harassment by Defendant Smith are not mentioned in the communications.

However, Plaintiff alleges that she sent Mr. Heller a letter raising her claims of sexual harassment in December of 2002, and that she complained to Defendant Lacey in November of 2002.  And, it is reasonable to assume that she made her then attorney, Mr. Myers, aware of her sexual harassment claims.  It is at least possible that the attorneys contemplated the settlement of all of Plaintiff's claims against the LRSD, including any claims of sexual harassment, through

---

[60]Exhibit 1, Vandiver Dep. p.133, Plaintiff's Response.

these communications.  However, there is no evidence, by affidavit or otherwise, supporting such a contention.

Based upon the present record, the Court must deny summary judgment on the basis of settlement and compromise.  However, if Defendants still contend that Plaintiff's sexual harassment claims are barred by the agreement, they may submit further briefing on this issue, including affidavits of the attorneys who negotiated same, assumably Mr. Myer and Mr. Heller. Similarly, Plaintiff may submit further briefing to rebut the argument that her claims have been settled, including arguments regarding the authority of her attorney.  If affidavits of the attorneys are submitted supporting the Defendants' contention that the settlement covered any potential sexual harassment claim, the Court will hold an evidentiary hearing, *see Gatz supra*, at which the parties can put on all relevant evidence, thus enabling the Court to resolve the issue.

### C.  Title VII Claim and Arkansas Civil Rights Act Claim[61]

Although not raised by the Defendants, it is obvious that the Title VII claims against Defendants Smith and Lacey in their individual capacities must be dismissed because "supervisors may not be held individually liable under Title VII."  *Schoffstall v. Henderson,* 223 F.3d 818, 821 n.2 (8th Cir. 2000).

---

[61]Neither party argues that a different standard for deciding the merits of Plaintiff's Arkansas Civil Rights Act (ACRA) claim applies.  "[T]he Arkansas Civil Rights Act expressly instructs [the courts] to look to federal civil-rights law when interpreting the Act."  *Island v.. Buena Vista Resort,* 352 Ark. 548, 557 (2003) (sexual harassment claim).  Additionally, the Arkansas Supreme Court has explained that Arkansas state courts may look to federal decisions for persuasive authority when considering claims under the ACRA.  *Id*. at 556-57.  However, the Court notes the arguments differentiating between the ACRA and Title VII regarding the time bar issue.

### 1. Time Bar

First, Defendants argue that Plaintiff's Title VII claim is time barred. "A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal court." *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006). "A claimant must first timely file an administrative charge with the EEOC"setting forth the facts and nature of the charge within 180 days of the discrimination and receive notice from the EEOC of the right to sue. *Id.* (citing 42 U.S.C. § 2000e-5(e); *Nichols v. Am. Nat'l Ins. Co,* 154 F.3d 875, 886 (8th Cir. 1998)). Defendant argues that the 180-day limitations period began to run on the last day that Plaintiff reported to work at Hall High School, December 9, 2002, and that no incident of harassment took place after this date. Plaintiff did not file her EEOC Charge of Discrimination until July 24, 2003, which was 227 days after December 9, 2002.

Plaintiff argues that the 180-day period did not begin to run until February 27, 2003, the day that she submitted her resignation because forcing her to resign was Defendants' final discriminatory employment decision. Specifically, Plaintiff argues that Defendant Smith informed her that if she would comply with his sexual advances and requests, she would not be terminated. Plaintiff states that she was terminated only because she refused to comply with Defendant Smith's requests, and therefore, there is a sufficient link between the harassment and what she argues was her constructive discharge. January 25, 2003 is the 180th day before July 24, 2003.

In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S. Ct. 2061, 2073 (2002), the Supreme Court stated, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." The Court further explained, "It

does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that *an act contributing to the claim* occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Morgan*, 536 U.S. at 117, 122 S. Ct. at 2074 (emphasis added).

Prior to the Supreme Court's decision in *Morgan*, the Eighth Circuit considered this issue in *Hukkanen v. Int'l Union of Operating Engineers, Hoisting & Portable Local No. 101*, 3 F.3d 281, 285 (8th Cir. 1993).  There, the defendants contended that the plaintiff's lawsuit was time-barred because she failed to file her discrimination charge with the EEOC within 180 days of the time that the plaintiff knew or reasonably should have known of sufficient facts to support a Title VII case.  *Id*.  However, the Eighth Circuit held that such an argument ignored the fact that the plaintiff "alleged and proved a pattern of sexual harassment that culminated in her constructive discharge."  *Id*.  The Eighth Circuit found that the defendant's last act of discrimination against the plaintiff was her constructive discharge, and that she filed her charge with the EEOC within 180 days of her constructive discharge, noting that "[w]hen Title VII violations are continuing in nature, the limitations period contained in § 2000e-5(e)(1) does not begin to run until the last occurrence of discrimination."  *Id*.  Therefore, as in *Hukkanen*, the Court finds that Plaintiff's claims are not time-barred.

However, as discussed below, the Court is concerned about the existence of evidence that her resignation was causally related to the alleged sexual harassment in regard to the quid pro quo harassment claim.  If the resignation/constructive discharge allegation is causally related, arguably, it is not an occurrence of discrimination.  In that event, Defendants' argument that the

last act related to the harassment occurred on December 9, 2002, may have merit, and Plaintiff's

Title VII hostile work environment claim would be time-barred.

Plaintiff also argues that even if her Title VII hostile work environment claim and quid

pro quo claims are time-barred, her claims are not precluded under the Arkansas Civil Rights Act

of 1993, which states:

> Any action based upon employment discrimination . . . shall be brought within
> one (1) year after the alleged employment discrimination occurred, or within
> ninety days of receipt of a "Right to Sue" letter or a notice of "Determination"
> from the United States Equal Employment Opportunity Commission concerning
> the alleged unlawful employment practice, whichever is later.

Ark. Code Ann. § 16-123-107(c)(3) (1993).  Defendants do not address this argument.  Arkansas

Code Annotated § 16-123-107(a)(1) provides in part:

> (a) The right of an otherwise qualified person to be free from discrimination
> because of race, religion, national origin, gender, or the presence of any sensory,
> mental, or physical disability is recognized as and declared to be a civil right. This
> right shall include, but not be limited to:

> > (1) The right to obtain and hold employment without discrimination;

Ark. Code Ann. § 16-123-107.  In *Island v. Buena Vista Resort*, 352 Ark. 548, 559, 103 S.W.3d

671, 677 (2003), the Arkansas Supreme Court found that the Arkansas Civil Rights Act is

applicable to workplace sexual harassment.  Therefore, it appears that Plaintiff's hostile work

environment and quid pro quo claims survive summary judgment under the Arkansas Civil

Rights Act.  However, as noted below, the merits of Plaintiff's quid pro quo claim are in

question, and if said claim is dismissed on the merits, her Arkansas Civil Rights Act quid pro

quo claim would have to be dismissed.

As a side note, the Court recognizes that Arkansas Code Annotated § 16-123-103(c)

provides that "[a] defendant may avoid liability under this subchapter by showing that his or her

actions were based on legitimate, nondiscriminatory factors and not on unjustified reasons."
However, in *Island*, the Arkansas Supreme Court rejected the defendant's argument that the
plaintiff was precluded from pursuing her sexual harassment claim because they were able to
give a non-gender-based reason for the plaintiff's termination stating:

> A review of the elements that must be established to present a valid sexual-
> harassment claim do not require the termination of the harassed employee.  In
> fact, an employee who is the subject of sexual harassment sometimes remains an
> employee after the harassment.  A lack of termination, or a non-gender-based
> reason for the employee's termination, does not extinguish a harassed employee's
> cause of action.

Additionally, the Eighth Circuit has stated, "An employer could never have a legitimate reason for
creating a hostile work environment. 'Rather, the key issue' in analyzing a hostile-work-
environment claim 'is whether members of one sex are exposed to disadvantageous terms or
conditions of employment to which members of the other sex are not exposed.'" *Stacks v.
Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994) ("The mixed-motives
analysis is inapplicable to a hostile-work-environment claim.") (citing *Kopp v. Samaritan Health
Systems, Inc.,* 13 F.3d 264, 269 (8th Cir.1993) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S.
17, ----, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993)).  Therefore, Plaintiff's hostile work
environment and quid pro quo claims under the Arkansas Civil Rights Act are not time barred.

### 2.  Merits of the Title VII and Arkansas Civil Rights Claims

Plaintiff alleges that she was subjected to a hostile work environment and to quid pro quo
harassment.  "Title VII [] prohibits both quid pro quo harassment, where an employee's
submission to or rejection of a supervisor's unwelcome sexual advances is used as the basis for
employment decisions, and hostile work environment harassment, where 'the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Tenge v. Phillips Modern Ag Co*., 446 F.3d 903, 907-08 (8th Cir. 2006).

In reviewing Plaintiff's discrimination claim, the Court must bear in mind that summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005).  Nonetheless, "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.*

To establish a prima facie case on her hostile work environment claim, Plaintiff must prove "(1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment." *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1006 n.9 (8th Cir. 2000). "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an objectively hostile or abusive work environment.'" *Id*.  "Relevant factors for determining whether conduct rises to this level include its frequency; severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

To overcome summary judgment on her hostile work environment claim, Plaintiff must present evidence from which a reasonable jury could find that Smith's conduct towards her was more than merely offensive, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment.

*Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004).  In *Henthorn*, the Eighth Circuit set forth cases that determined whether the alleged conduct constituted a hostile work environment.  *Id.* (comparing *Duncan v. General Motors Corp.,* 300 F.3d 928 (8th Cir. 2002) (finding plaintiff failed to prove a hostile work environment claim when she was asked out, criticized, asked to sketch pottery with a sexual theme, and unnecessarily touched on the hand); *Alagna v. Smithville R-II Sch. Dist.,* 324 F.3d 975, 980 (8th Cir. 2003) (finding to be inappropriate but not actionable conduct that involved frequent calls to plaintiff's home, regular visits to her office, the bestowing of gifts, the touching of plaintiff's arm, and the frequent expressions of "I love you"), with *Eich v. Bd. of Regents for Cent. Mo. St. Univ.,* 350 F.3d 752, 755-56 (8th Cir. 2003) (finding conduct sufficiently severe when plaintiff was frequently touched in numerous suggestive ways and was subject to simulated sex acts.); *Beard v. Flying J., Inc.,* 266 F.3d 792, 797 (8th Cir. 2001) (affirming a judgment for plaintiff based on another employee brushing, rubbing and flicking plaintiff's breasts and pointing to his crotch); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 838 (8th Cir. 1998) (describing a co-employee constantly saying sexual innuendos, brushing up against plaintiff and telling lewd jokes with gestures); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1262-63 (8th Cir. 1997) (reversing summary judgment for the employer where plaintiff faced consistent ridicule and derogatory comments about women, even though they were not sexually explicit); *Hathaway v. Runyon,* 132 F.3d 1214, 1217-18 (8th Cir. 1997) (finding a jury reasonably ruled for plaintiff when she was subject to two offensive touchings, followed by constant snickering and guttural noises from two other employees)).  Plaintiff's factual allegations and her deposition testimony clearly set out an egregious prima facie case of hostile work environment sexual harassment by her supervisor.

Plaintiff also argues that she was subject to quid pro quo harassment.  To establish a prima facie case on her quid pro quo claim, Plaintiff must prove "(1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment." *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1006 n.8 (8th Cir. 2000).

The Eighth Circuit has stated that "a claim of quid pro quo harassment often adds little to a straightforward Title VII analysis." *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004).  "Both quid pro quo and hostile work environment sexual harassment claims are grounded in the same legal theory under Title VII, the former involving an explicit, and the latter a constructive, change in conditions of employment." *Id.*  "Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands." *Id.* at 1026-27.  "A plaintiff in that situation need not prove that the offensive conduct is severe or pervasive because any carried-out threat is itself deemed an actionable change in the terms or conditions of employment." *Id.* at 1027.

Plaintiff's claimed tangible employment action is that she was constructively discharged. To establish her constructive discharge, Plaintiff must show that "a reasonable person would have found the conditions of her employ intolerable and that the employer either intended to force her to resign or could have reasonably foreseen she would do so as a result of its actions." *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 n.13 (8th Cir. 2000) (citing *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017 (8th Cir.1999)).  In *Ogden*, the Eighth Circuit upheld the jury's

determination that the plaintiff was constructively discharged when the jury concluded that the harassment rendered the plaintiff's working conditions objectively intolerable, the plaintiff testified that her employer told her she could no longer remain with the company in the wake of her allegations, and that the company either intended to force the plaintiff to resign or could have reasonably foreseen she would do so." *Id*. Here, Plaintiff alleges that she reported the alleged harassment to both Defendant Lacey and the attorney for the Little Rock School District, yet the harassment continued. Furthermore, Plaintiff asserts, and Defendant admits, that Plaintiff was told that if she did not resign, she would be terminated.

Here, to prevail on summary judgment, Defendants must either demonstrate that Plaintiff has failed to establish her prima facie case, or that they are entitled to an affirmative defense. If there is no tangible employment action, and a plaintiff makes out a prima facie case of hostile work environment, an employer is vicariously liable for the supervisor's harassment unless the employer establishes the two-step *Ellerth* defense: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 751-54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, the affirmative defense is not available if Plaintiff sustains a claim of constructive discharge, which constitutes a tangible employment action. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807-08, 118 S.Ct. 2275, 2293 (1998) ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.").

29

Defendants have not argued that this affirmative defense applies.  In their Motion for Summary Judgment, Defendants do not assert that Plaintiff failed to establish a prima facie case. Rather, Defendants argue, under the *McDonnell Douglas* standard, that they have demonstrated a legitimate, nondiscriminatory reason for recommending her termination, and Plaintiff has failed to demonstrate that the proffered reason is pretextual.  However, the *McDonnell Douglas* standard does not apply to claims of quid pro quo harassment and hostile work environment.  Therefore, summary judgment is denied as to Plaintiff's Title VII sexual harassment claims.

However, the Court expresses its concern regarding the ability of Plaintiff to establish the fourth element of her prima facie case of quid pro quo harassment, which would require her to demonstrate that her refusal to submit *resulted* in a tangible job detriment.  In this case, it appears that Dr. James, based upon the undisputed facts in his letters, intended to recommend Plaintiff's termination to the Board, which would make the ultimate decision as to her employment. Furthermore, it appears that Plaintiff admits that she has no proof that Dr. James had any knowledge of the alleged harassment, or that he based his decision to recommend the termination of Plaintiff upon anything other than the facts set forth in his letters.

Furthermore, in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)*,* "the Supreme Court announced the standards for deciding whether an employer is vicariously liable for a supervisor's sexually harassing conduct and stated the labels quid pro quo and hostile work environment are no longer controlling for purposes of establishing employer liability."  *Newton v. Cadwell Labs.,* 156 F.3d 880, 883 (8th Cir. 1998).  "Putting these so-called labels aside, the Court held that *when a supervisor's sexual harassment of an employee*

*results in a tangible employment action* such as discharge, demotion, or undesirable reassignment, the employer is vicariously liable to the employee."  *Id.* (emphasis added) (citing *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2292-93).

The Fifth Circuit in *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000), explained the methodology specified by the Supreme Court for disposing of all supervisor sexual harassment cases under Title VII in *Ellerth* and *Faragher.*  The court stated:

> At the first stop on the *Ellerth/Faragher* road map, courts are required to determine whether the complaining employee has or has not suffered a "tangible employment action."  If he has, his suit is classified as a "quid pro quo" case; if he has not, his suit is classified as a "hostile environment" case.  That determination provides a fork in the road on the *Ellerth/Faragher* map: In a "quid pro quo" case, the road branches toward a second stop at which the court must determine whether the tangible employment action suffered by the employee resulted from his acceptance or rejection of his supervisor's alleged sexual harassment.[FN7] If the employee cannot show such a nexus, then his employer is not vicariously liable under Title VII for sexual harassment by a supervisor; but if the employee can demonstrate such a nexus, the employer is vicariously liable per se and is not entitled to assert the one and only affirmative defense permitted in such cases since *Ellerth* and *Faragher.*  In other words, proof that a tangible employment action did result from the employee's acceptance or rejection of sexual harassment by his supervisor makes the employer vicariously liable, *ipso facto;* no affirmative defense will be heard.

*Id.* at 283-84.

In this case, Plaintiff alleges that her resignation/constructive discharge was the result of her rejection of Defendant Smith's unwanted sexual advances.  In essence, she argues that because she rejected Defendant Smith's advances, he recommended her termination, and that she was forced to either resign or be terminated.  However, the Court questions whether Plaintiff can show that her alleged harasser, Defendant Smith, made the decision to terminate her, resulting in her resignation.

In *Hill v. Lockheed Martin Logistics Management, Inc*., 354 F.3d 277, 291 (4th Cir. 2004),

the Fourth Circuit discussed liability of employers in the Title VII and ADA context stating:

> Regarding adverse employment actions, an employer will be liable not for the
> improperly motivated person who merely influences the decision, but for the
> person who in reality makes the decision. This encompasses individuals who may
> be deemed actual decisionmakers even though they are not formal
> decisionmakers, such as in *Reeves,* where the husband of the formal
> decisionmaker wielded absolute power within the company, and in *Shager,* where
> the supervisor's reports and recommendation were merely rubber-stamped by the
> formal decisionmaking committee. In sum, to survive summary judgment, an
> aggrieved employee who rests a discrimination claim under Title VII . . . upon the
> discriminatory motivations of a subordinate employee must come forward with
> sufficient evidence that the subordinate employee possessed such authority as to
> be viewed as the one principally responsible for the decision or the actual
> decisionmaker for the employer.

Additionally, in *Hill*, the Fourth Circuit stated:

> Nor would it be appropriate to withhold summary judgment from an employer
> who has terminated an employee for rules violations, and wholly in the absence of
> any discriminatory motivation on the part of the decisionmakers, simply because
> the violations might not have been known in the absence of a subordinate's
> discriminatory animus that brought the infractions to light.  Otherwise, an
> unbiased employer could never discipline or terminate an employee for an
> undisputed violation of company rules, including such egregious acts as fighting
> or stealing (or endangering the lives of those who fly on aircraft carelessly
> attended by a mechanic), so long as the employee could demonstrate that she was
> "turned in" by a subordinate employee "because of" a discriminatory motivation.

354 F.3d at 296.

Also, in *Russell v. University of Texas of Permian Basin,* 2007 WL 1879157, *5 (5th Cir.

2007), the Fifth Circuit held that the plaintiff's claim of quid pro quo sexual harassment could

not withstand the defendant's motion for summary judgment because she failed to demonstrate

that the alleged harasser caused the tangible employment action.  The court stated, "In other

words, she has presented no competent summary judgment evidence that her alleged harasser was responsible for the decision not to hire her for the tenure-track position." *Id.* (citing *Casiano,* 213 F.3d 278, 284-85 (5th Cir. 2000) (finding no tangible employment action where an employee was denied access to a training program because another manager, not the harassing supervisor, was responsible for the decision); *Long v. Eastfield Coll.,* 88 F.3d 300, 307 (5th Cir. 1996) (stating that the "causal link" between retaliatory intent and adverse employment action is broken if those with the retaliatory intent are not responsible for the adverse employment action)).  In *Russell*, although the alleged harasser was part of the search committee that made the initial recommendation to hire another candidate for the position, the Court found that the search committee, not the alleged harasser, made the initial recommendation, and that recommendation did not become final until it was approved by two other superiors.  Additionally, the Court found that the plaintiff did not demonstrate that those with discriminatory intent had influence or leverage over the official decisionmaker, such that it would be proper to impute their discriminatory attitudes to the formal decisionmaker." *Id.* (citing *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir. 2000)).  The court stated that in addition to cases of influence or leverage, "the ultimate decisionmaker could inherit the taint of discriminatory intent if he 'merely acted as a rubber stamp,' or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent." *Id.*

The Court questions whether Plaintiff can present evidence that Defendant Smith possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.  As stated above, it appears that Dr. James, based upon the undisputed facts in his letters, recommended Plaintiff's termination to the Board, who had

ultimate approval.  Also, as stated above, the Court doubts whether Plaintiff can present proof

that Dr. James had any knowledge of the alleged harassment, or that he based his decision to

recommend the termination of Plaintiff upon anything other than the facts set forth in his letters.

The Court also questions whether Plaintiff can demonstrate that Defendant Smith had influence

or leverage over the official decisionmaker, such that it would be proper to impute his

discriminatory attitude to the formal decisionmaker, or that Dr. James merely acted as a rubber

stamp or the cat's paw for Defendant Smith.

The Court also questions what impact, if any, Plaintiff's claim of Post Traumatic Stress

Disorder ("PTSD") has in this case.  There are no expert medical or psychiatric opinions in this

summary judgment record.  Is Plaintiff claiming that Defendant Smith's harassment caused her

PTSD and that that condition in turn resulted in her actions described in the termination letters?

If so, at this juncture, she has failed to adequately set forth that argument.  Therefore, while the

Court denies summary judgment based upon the present record and arguments, the Court will

allow the parties to further brief the issues discussed above.

### D.  Title IX Claim

Plaintiff also asserts a private cause of action under Title IX based upon the alleged

sexual harassment.  The parties dispute whether Plaintiff has a private right of action under Title

IX.  The Eighth Circuit has remarked that "to the degree [a plaintiff] relies upon teaching

conditions, such as course assignments," a Title IX claim "merely duplicates" a Title VII claim.

*Brine v. Univ. of Iowa,* 90 F.3d 271, 276 (8th Cir. 1996) (quoting *O'Connor v. Peru State*

*College,* 781 F.2d 632, 642 n. 8 (8th Cir. 1986)).  In *Brine*, the Eighth Circuit stated:

> Other circuits have explicitly declared that for employment discrimination cases, "the Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896 (1st Cir.1988); *see also Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 206-07 (4th Cir.1994), and *Mabry v. State Board of Community Colleges and Occupational Education,* 813 F.2d 311, 316-17 n. 6 (10th Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). We are persuaded by those opinions and therefore uphold the trial court's action.

*Id.* If summary judgment is appropriate as to Plaintiff's Title VII and parallel Arkansas Civil Rights Act claims, the Court could assume without deciding that a private right of action exists under Title IX, and grant summary judgment as to the Title IX claim.

However, if summary judgment is not appropriate as to Plaintiff's Title VII or parallel Arkansas Civil Rights Act claims, the Court would need to decide whether Plaintiff can assert a private cause of action under Title IX based upon the alleged sexual harassment. The parties dispute whether Plaintiff has a private right of action under Title IX. The Eighth Circuit has remarked that "to the degree [a plaintiff] relies upon teaching conditions, such as course assignments," a Title IX claim "merely duplicates" a Title VII claim. *Brine v. Univ. of Iowa,* 90 F.3d 271, 276 (8th Cir. 1996) (quoting *O'Connor v. Peru State College,* 781 F.2d 632, 642 n. 8 (8th Cir. 1986)). In *Brine,* the Eighth Circuit stated:

> Other circuits have explicitly declared that for employment discrimination cases, "the Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896 (1st Cir.1988); *see also Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 206-07 (4th Cir.1994), and *Mabry v. State Board of Community Colleges and Occupational Education,* 813 F.2d 311, 316-17 n. 6 (10th Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). We are persuaded by those opinions and therefore uphold the trial court's action.

*Id.* Even if the Court dismisses Plaintiff's quid pro quo sexual harassment claims under Title VII on the merits, Plaintiff's hostile work environment claims under Title VII were only time barred under Title VII. As discussed in regard to Plaintiff's Arkansas Civil Rights Act hostile work environment claim, Plaintiff's hostile work environment claim would survive summary judgment on the merits. Therefore, arguably, Plaintiff's hostile work environment claim would survive under Title IX, if a private right of action exists.

In *Cooper v. Gustavus Adolphus College,* 957 F. Supp. 191, 192 n.1 (D. Minn. 1997), the district court noted that the Eighth Circuit has been presented with a claim for damages for employment discrimination under Title IX. (citing *O'Connor v. Peru State College,* 781 F.2d 632 (8th Cir. 1986)). "However, that decision did not determine whether such a claim is generally cognizable, because it was dismissed on the grounds that the employee, an athletic coach, did not work for a federally funded program." *Id.* Therefore, the Eighth Circuit has not addressed the issue of whether a private right of action exists under Title IX. *Id.* at 193 n.2 (citing *Brine v. Univ. of Iowa,* 90 F.3d 271, 276 (8th Cir.1996) (university did not "challenge the proposition that a private right of action exists under Title IX")).

In *Cooper*, the district court stated:

> Title IX prohibits sex discrimination on the part of educational programs that receive federal funds. The remedy for discrimination explicitly set forth in the statute is the denial of federal funding. *Id.* The courts have recognized an implied cause of action on behalf of students and prospective students who are discriminated against in education. *Franklin v. Gwinnett County, Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992); *Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994). Furthermore, a lawsuit under Title IX may challenge the validity of administrative regulations terminating federal funding of an educational institution that discriminated on the basis of sex in employment

practices.  *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) ("Bell").

However, most courts have rejected the theory that employees of an educational institution have an implied cause of action for damages under Title IX.  *Lakoski v. James,* 66 F.3d 751, 754 (5th Cir.1995); *Howard v. Bd. of Educ. Sycamore Community Unit,* 893 F. Supp.808, 815 (N.D. Ill. 1995); *Wedding v. Univ. of Toledo,* 862 F.Supp. 201, 203-04 (N.D. Ohio 1994); *Storey v. Bd.* of Regents, 604 F. Supp. 1200, 1205 (W.D. Wis. 1985).  These courts have all reached the conclusion that since Title VII provides a comprehensive and carefully balanced remedial mechanism for redressing employment discrimination, and since Title IX does not clearly imply a private cause of action for damages for employment discrimination, none should be created by the courts.

*Id*. at 192-93.  The court rejected *Henschke v. New York Hospital-Cornell Medical Ctr.,* 821 F. Supp. 166, 172 (S.D.N.Y. 1993), determining that it failed to appropriately consider the impact of the existence of Title VII remedies for employment discrimination.  *Id.* at 193.  Instead, the court concluded that "there is no private action for damages available to a college employee under Title IX for sex discrimination."  *Id.*

However, in *Bedard v. Roger Williams University,* 989 F. Supp. 94, 97 -98 (D.R.I. 1997), the district court stated, "this court agrees with those courts which predictively view the Supreme Court's 'next logical step' as being to recognize a private cause of action under Title IX for employment discrimination against a federally funded education program."  (citing *Bowers v. Baylor Univ.,* 862 F. Supp. 142, 145 (W.D. Tex. 1994); *Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 205- 06 (4th Cir. 1994); *Nelson v. Univ. of Maine Sys.,* 923 F. Supp. 275, 278-79 (D. Me. 1996)).  However, the court recognized that "other courts have argued that to read a private cause of action for employment discrimination into Title IX would disrupt the 'carefully balanced remedial scheme for redressing' such grievances as mandated by Congress through Title VII.  *Id*. (citing *Lakoski v. James,* 66 F.3d 751, 754 (5th Cir.

1995); *Cooper v. Gustavus Adolphus College,* 957 F.Supp. 191, 193 (D. Minn.1997); *Howard v.*

*Bd. of Educ. of Sycamore Community Unit Sch. Dist.,* 893 F.Supp. 808, 815 (N.D. Ill. 1995);

*Wedding v. Univ. of Toledo,* 862 F.Supp. 201, 203-04 (N.D. Ohio 1994)).

In *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-75, 125 S.Ct. 1497, 1503-05

(2005), the Supreme Court stated:

> Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). More than 25 years ago, in *Cannon v. University of Chicago,* 441 U.S. 677, 690-693, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), we held that Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination. In subsequent cases, we have defined the contours of that right of action. In *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), we held that it authorizes private parties to seek monetary damages for intentional violations of Title IX. We have also held that the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student, *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 290-291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), or to sexual harassment of a student by another student, *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).
>
> In all of these cases, we relied on the text of Title IX, which, subject to a list of narrow exceptions not at issue here, broadly prohibits a funding recipient from subjecting any person to "discrimination" "on the basis of sex." 20 U.S.C. § 1681. Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of " discrimination" because the complainant is being subjected to differential treatment. *See generally Olmstead v. L. C.,* 527 U.S. 581, 614, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (KENNEDY, J., concurring in judgment) (the "normal definition of discrimination" is "differential treatment"); *see also Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, n. 22, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (discrimination means "less favorable" treatment). Moreover, retaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a

person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

The Court of Appeals' conclusion that Title IX does not prohibit retaliation because the "statute makes no mention of retaliation," 309 F.3d, at 1344, ignores the import of our repeated holdings construing "discrimination" under Title IX broadly. Though the statute does not mention sexual harassment, we have held that sexual harassment is intentional discrimination encompassed by Title IX's private right of action. *Franklin,* 503 U.S., at 74-75, 112 S.Ct. 1028; see also *id.,* at 75, 112 S.Ct. 1028 (noting that, under *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), " 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex,' " and holding that "the same rule should apply when a teacher sexually harasses ... a student"). Thus, a recipient's deliberate indifference to a teacher's sexual harassment of a student also "violate[s] Title IX's plain terms." *Davis, supra,* at 643, 119 S.Ct. 1661 (citing *Gebser, supra,* at 290-291, 118 S.Ct. 1989). Likewise, a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes "discrimination" "on the basis of sex." *Davis,* 526 U.S., at 643, 119 S.Ct. 1661; see also *id.,* at 650, 119 S.Ct. 1661 ("Having previously determined that 'sexual harassment' is 'discrimination' ... under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute"). "Discrimination" is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach. See *North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (Courts " 'must accord' " Title IX " 'a sweep as broad as its language' ").

In *Jackson*, the Court concluded that Title IX's private right of action encompassed a claim of retaliation brought by a former coach of a girls' high school basketball team who advocated for the rights of the team. *Id*. at 178, 125 S.Ct. at 1507. Based upon the Supreme Court's broad construction of "discrimination" under Title IX, the Court is inclined to find that a private right of action exists under Title IX in this case, and that Plaintiff's claims of hostile work environment and quid pro quo harassment survive under Title IX. However, as with the Arkansas Civil Rights Act quid pro quo claim, if Plaintiff's quid pro quo claim fails on the merits, it is likely that her quid pro quo claim under Title IX would be dismissed. The Court

notes that neither party has briefed the impact of *Jackson*, if any, on this issue.  Therefore, while the Court must deny summary judgment on the present record, the Court will allow the parties to further brief this issue as well.

### E.  Retaliation

In her Complaint, Plaintiff also alleges that she suffered retaliation as a result of her complaints of harassment.  Defendants *McDonnell Douglas* arguments, discussed above, apply to this cause of action.  To establish a prima facie case of retaliation, Plaintiff has the burden to show that she engaged in protected activity, that Defendants took adverse action against her, and that there was a causal connection between those two actions. *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004).  If the plaintiff establishes a prima facie case of retaliation, the Court must analyze the case under the burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  *Henthorn*, 359 F.3d at 1028.  The Court must examine whether the defendant has offered a legitimate, nondiscriminatory reason for its actions and whether the plaintiff has presented any evidence that the explanation given is pretextual.  *Id.*

Assuming, without deciding, that Plaintiff has made a prima facie case of retaliation, including that Plaintiff was constructively discharged, LRSD has articulated a nondiscriminatory reason for such discharge.  Plaintiff's admitted misconduct, detailed in the termination letters sent to Plaintiff by Dr. James, namely Plaintiff's actions in "squirt[ing] water on students and curs[ing] students," her "behavior in the conference with [her] principal on December 10, 2002, including, but not limited to where [she] tore up [her] letter from him," and her phone call to Mr. Moore on January 14, 2003, where she threatened to kill Mr. Smith and threatened that her

40

students "were going to do to Hall what the kids did at Columbine."  Plaintiff admits to her

actions, as detailed in Dr. James' letters, and has failed to present any evidence that the reasons

set forth are pretextual.  Therefore, summary judgment is appropriate on Plaintiff's retaliation

claim.

### F.  Section 1983, Arkansas Civil Rights Act, and Negligent or Intentional Infliction of Emotional Distress

In their motion, Defendants have not addressed Plaintiff's claims pursuant to § 1983.

Similarly, Defendants do not address Plaintiff's parallel cause of action under the Arkansas Civil

Rights Act, which provides:

> a) Every person who, under color of any statute, ordinance, regulation, custom, or
> usage of this state or any of its political subdivisions subjects, or causes to be
> subjected, any person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Arkansas Constitution shall be
> liable to the party injured in an action in circuit court for legal and equitable relief
> or other proper redress.
> . . .
> (c) When construing this section, a court may look for guidance to state and
> federal decisions interpreting the federal Civil Rights Act of 1871, as amended
> and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which decisions
> and act shall have persuasive authority only.

Ark. Code Ann. § 16-123-105.  Deprivation of a right secured by Title VII by one acting under

color of state law constitutes grounds for a § 1983 claim.  *Morrow v. City of Jacksonville*, 941 F.

Supp. 816, 826 (E.D. Ark. 1996).  Therefore, these claims will proceed.

Additionally, Defendants have not addressed Plaintiff's claim for negligent or intentional

infliction of emotional distress.  However, the Court notes that it is well established that

Arkansas does not recognize the tort claim of negligent infliction of emotional distress.  *See*

*Mechanics Lumber Co. v. Smith*, 296 Ark. 285, 289, 752 S.W.2d 763, 765 (1988).  Therefore,

summary judgment is granted as to Plaintiff's claim of negligent infliction of emotional distress. However, Plaintiff's claim of intentional infliction of emotional distress, or outrage,[62] will proceed.

## CONCLUSION

As explained above, the Court finds the doctrine of judicial estoppel is not applicable in this case. Additionally, based upon the present record, the Court would have to deny summary judgment on the basis of settlement and compromise. However, the Court will allow the parties to further brief this issue, and depending on the parties' submissions, the Court may hold an evidentiary hearing on, or prior to, the first day of trial, September 10, 2007.

As to Plaintiff's Title VII and parallel Arkansas Civil Rights Act claims, Plaintiff's claims against Defendants Smith and Lacey in their individual capacities are dismissed.

---

[62]In *Island v. Buena Vista Resort*, 352 Ark. 548, 565, 103 S.W.3d 671, 680-81 (2003), the Arkansas Supreme Court stated:

> We have recognized a cause of action for the tort of outrage in an employment setting. *See M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980). We have explained that liability [for the tort of outrage] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Palmer, supra.* (*Citing the Restatement (Second) of Torts* § 46 Cmt. d (1965)).
>
> There are four elements that are necessary to establish liability for the tort of outrage: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Faulkner v. Arkansas Children's Hosp.,* 347 Ark. 941, 69 S.W.3d 393 (2002).

Summary judgment is denied as to Plaintiff's Title VII, Arkansas Civil Rights Act, and Title IX hostile work environment and quid pro quo sexual harassment claims.  As discussed above, the parties may further brief these issues.

Summary judgment is granted as to Plaintiff's retaliation claim.  As Defendants did not address Plaintiff's claim pursuant to section 1983 and Plaintiff's parallel Arkansas Civil Rights Act claim pursuant to Arkansas Code Annotated section 16-123-105, those claims will proceed. While summary judgment is granted as to Plaintiff's claim of negligent infliction of emotional distress, as Arkansas does not recognize such a cause of action, Plaintiff's claim of intentional infliction of emotional distress will proceed.

If Defendants wish to further pursue summary judgment, they shall file their motion and additional briefing on or before August 30, 2007.  Plaintiff shall have the opportunity to respond on or before September 4, 2007.  Trial in this matter is set for September 10, 2007.

Accordingly,

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Docket No. 62) be, and it is hereby, GRANTED in part, and DENIED in part as set forth above.

IT IS SO ORDERED this 27th day of August, 2007.

/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE