**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**JALISHA VANDIVER**                                                                 **PLAINTIFF**


**v.**                                **CASE NO. 4:03-CV-00834 GTE**


**LITTLE ROCK SCHOOL DISTRICT;**
**VERNON SMITH, JR., individually and in**
**his official capacity as Principal of Hall High**
**School; MARIAN LACEY, individually and in**
**her official capacity as Assistant Superintendent of**
**Secondary Education of Little Rock School District**              **DEFENDANTS**

<u>**ORDER**</u>

Presently before the Court is Defendants' Supplemental Motion for Summary Judgment.

**I.  Background**

In the Court's Order on Defendants' original Motion for Summary Judgment, the Court

stated the background facts as follows:  Plaintiff came to work at the Little Rock School District

("LRSD") in August of 2002.[1]  Vernon Smith, the Principal of Hall High at the time, hired her as

a long-term substitute teaching ninth and tenth grade English at Hall High School.[2]

Approximately one month later, she was hired as a full-time teacher at Hall High.[3]  Her last day

at work was December 9, 2002.  She resigned effective February 27, 2003 pursuant to a February

26, 2003, agreement with the LRSD.

---

[1]Exhibit 1, Vandiver Dep. p. 6, Defendants' Motion for Summary Judgment
("Defendants' Motion").

[2]Exhibit 1, Vandiver Dep. p. 6, Defendants' Motion.

[3]Exhibit 1, Vandiver Dep. p. 10, Defendants' Motion.

Plaintiff testified that approximately two weeks after her date of hire, Defendant Smith began making unsolicited and unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature to her.[4]  She states that Defendant Smith's inappropriate remarks and conduct continued on a very regular basis throughout her employment.[5]  Plaintiff alleges that Defendant Smith asked her to perform oral sex on him as payment for giving her the job, informed her that he wanted to have sexual intercourse with her in his office, and told her that he could have sexual intercourse with her in the classroom and no one would care.[6]  Plaintiff asserts that she reported the sexual harassment to Marian Lacey, Assistant Superintendent of Secondary Education of the LRSD in mid-November 2002.[7] According to Plaintiff, after she told Dr. Lacey that Defendant Smith threatened her job if she did not perform sexual acts, Dr. Lacey stated that she "would take care of it" and "it would never happen again."[8]  Plaintiff also asserts that she spoke with other teachers at Hall High School who informed her that Separate Defendant Smith made sexually inappropriate comments to them as well.[9]

---

[4]Exhibit 1, Vandiver Dep. p. 12, Plaintiff's Response to Defendants' Motion ("Plaintiff's Response").

[5]Exhibit 1, Vandiver Dep. p. 14, 19, 20, 22, 24, 27-29, 46-50, 56-59, 71, 97, 128, 160, Plaintiff's Response.

[6]Exhibit 1, Vandiver Dep. p. 27, 29, 56-57, Plaintiff's Response.

[7]Exhibit 1, Vandiver Dep. p. 23, Plaintiff's Response.

[8]Exhibit 1, Vandiver Dep. p. 23-24, Plaintiff's Response.

[9]Exhibit 1, Vandiver Dep. p. 62-65, Plaintiff's Response.

Plaintiff admits that she squirted two students with a water bottle during class on November 11, 2002.[10]  Plaintiff left school on November 11, 2002, and went to the hospital.[11] She was cleared to return to work on November 25, 2002, but had to go home.[12]  After Thanksgiving break, she returned for her first full week back during the first week of December.[13]  Plaintiff admits to squirting two students with a water bottle during class in a statement dated December 1, 2002.[14]  In a statement dated December 3, 2002, Plaintiff admits that she used profanity toward her students on more than one occasion.[15]  Specifically, she told one student to "sit your ass down and shut your face," another student to "sit your ass down," and another student to "sit your ass down, shut your face, and read."[16]  Plaintiff admitted that she had been informed that the use of profanity violated district policy.[17]

However, Plaintiff asserts that she wrote the two statements discussed above at the direction of Defendant Smith under duress, but she admits the truthfulness of those statements.

---

[10]Exhibit 1, Vandiver Dep. p. 80, Defendants' Motion; Exhibit 2, Vandiver Statement 1, Defendants' Motion.

[11]Exhibit 1, Vandiver Dep. p. 51, Defendants' Motion.

[12]Exhibit 1, Vandiver Dep. p. 51, Defendants' Motion.

[13]Exhibit 1, Vandiver Dep. p. 51-52, Defendants' Motion.

[14]Exhibit 1, Vandiver Dep. p. 80, Defendants' Motion; Exhibit 2, Vandiver Statement 1, Defendants' Motion.

[15]Exhibit 1, Vandiver Dep. p. 96, Defendants' Motion; Exhibit 3, Vandiver Statement 2, Defendants' Motion.

[16]Exhibit 3, Vandiver Statement 2, Defendants' Motion.

[17]Exhibit 1, Vandiver Dep. p. 101, Defendants' Motion; Exhibit 3, Vandiver Statement 2, Defendants' Motion.

Plaintiff also disputes Defendant Smith's interpretation of the definition of "profanity." Additionally, Plaintiff states that she was suffering from Post Traumatic Stress Disorder at the time she squirted the students with water and made the comments at issue to her students.[18]

Plaintiff asserts that on or about December 2, 2002, she made a written complaint to Chris Heller, attorney for the LRSD, concerning the sexually harassing conduct being perpetrated by Separate Defendant Smith.[19]  She also asserts that she sent a letter to Separate Defendant Smith on or about December 4, 2002, stating that his behavior was affecting her job and asking him to stop.[20]

On December 5, 2002, Plaintiff reported to Defendant Smith's office for a disciplinary meeting.[21]  Plaintiff asserts that Separate Defendant Smith informed her that she did not have to be terminated if she would "just pay up," but she refused.[22]  Although Georgia Walton was initially present at the meeting as a union representative, she left after Plaintiff stated that she was not in the union and that Ms. Walton was not her representative.[23]  Defendant Smith called Beverly Williams, LRSD's Director of Human Resources, who informed Plaintiff that the District would allow her to resign for personal reasons.[24]  Plaintiff was given a resignation form

---

[18]Exhibit 3, Medical Report, Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response").

[19]Exhibit 1, Vandiver Dep. p. 42-43, Plaintiff's Response.

[20]Exhibit 1, Vandiver Dep. p. 43, Plaintiff's Response.

[21]Exhibit 1, Vandiver Dep. p. 104, Defendants' Motion.

[22]Exhibit 1, Vandiver Dep. p.127-28, Plaintiff's Response.

[23]Exhibit 1, Vandiver Dep. p. 104-05, Defendants' Motion.

[24]Exhibit 1, Vandiver Dep. p. 105, Defendants' Motion.

and told to return it whether or not she signed it.[25]  The last day Plaintiff reported to work at Hall High School was December 9, 2002.[26]

On or around December 10, 2002, Plaintiff returned for a meeting with Defendant Smith, Judy Zink and Ken Moore.[27]  Plaintiff informed Mr. Smith that she flushed the resignation form down the toilet because that is what you do "with shit."[28]  Plaintiff was given a letter signed by Defendant Smith, which Plaintiff tore up.[29]  Plaintiff was sent the letter dated December 10, 2002, signed by Dr. James, Superintendent of Schools for the Little Rock School District, stating his reasons for the recommendation of termination.[30]  Specifically, Dr. James states, "Upon the recommendation of . . . Mr. Vernon Smith, and in compliance with the terms of the Arkansas Teacher Fair Dismissal Act, I am notifying you that I will recommend to the Board of Directors that your teaching contract with the Little Rock School District be terminated."[31]  He further states, "My recommendation is based on the fact that you exhibited unprofessional conduct."[32] Dr. James specifically references Plaintiff's actions in "squirt[ing] water on students and cursed students" and her "behavior in the conference with [her] principal on December 10, 2002,

---

[25]Exhibit 1, Vandiver Dep. p. 105, Defendants' Motion.

[26]Exhibit 1, Vandiver Dep. p. 52, Defendants' Motion.

[27]Exhibit 1, Vandiver Dep. p. 110, Defendants' Motion.

[28]Exhibit 1, Vandiver Dep. p. 110, Defendants' Motion.

[29]Exhibit 1, Vandiver Dep. p. 110-11, Defendants' Motion.

[30]Exhibit 7, James Letter, Defendants' Motion.

[31]Exhibit 7, James Letter, Defendants' Motion.

[32]Exhibit 7, James Letter, Defendants' Motion.

including, but not limited to where [she] tore up [her] letter from him."[33]  Plaintiff admits that the

reasons stated in the letter from Dr. James are true.[34]

Plaintiff returned to Hall High on January 10 and 13, but was asked to leave, and on

January 13, she was escorted off campus.[35]  Plaintiff admits that on January 14, 2003, she called

Ken Moore, Assistant Principal, and told him that she had a gun, was "going to come up to the

school," and "kill Mr. Smith."[36]  She admits that she told Mr. Moore that she "was going to have

[her] students do a Columbine."[37]  In her deposition, Plaintiff states that Mr. Moore's statement

is "completely true."[38]  The statement by Ken Moore, dated January 14, 2003, states:

> On Tuesday, January 14, 2003, Ms. J. Vandiver called me and said that she was
> going to kill Mr. Smith and that her students were going to do to Hall what the
> kids did at Columbine, but only worse.  She said that she was sick and that she
> would do anything.  Also, she has visions about the mass murder at Hall.
>
> I told Ms. Vandiver that I would have to report this matter to the police and that I
> was not happy that she had put me in the middle of her mess.  She said, that was
> why she told me, because she knew that I would stop her before she did something
> that she did not want to do.[39]

---

[33]Exhibit 7, James Letter, Defendants' Motion.

[34]Exhibit 1, Vandiver Dep. p. 126, Defendants' Motion.

[35]Exhibit 1, Vandiver Dep. p. 113, Defendants' Motion.

[36]Exhibit 1, Vandiver Dep. p. 120-21, Defendants' Motion.

[37]Exhibit 1, Vandiver Dep. p. 121, Defendants' Motion.

[38]Exhibit 1, Vandiver Dep. p. 122, Defendants' Motion.

[39]Exhibit 4, Moore Statement, Defendants' Motion.

In a letter dated January 15, 2003, Plaintiff was informed that she had been suspended.[40]
In a letter dated February 13, 2003, Dr. James informed Plaintiff that he would recommend
termination based upon her phone call to Mr. Moore on January 14, 2003, where she threatened
to kill Mr. Smith and threatened that her students "were going to do to Hall what the kids did at
Columbine."[41]  Plaintiff admits that the reasons stated in the second letter from Dr. James are
also true.[42]  Plaintiff states that she was suffering from Post Traumatic Stress Disorder at the time
she made this phone call.[43]

On or about February 24, 2003, Plaintiff's attorney, John Myers and LRSD attorney Chris
Heller began communicating about the terms of Plaintiff's resignation.[44]  An e-mail from Mr.
Heller to Mr. Myers dated February 26, 2003, states:

> I'M WRITING TO CONFIRM OUR AGREEMENT TO RESOLVE THE
> ISSUES WHICH OTHERWISE WOULD HAVE BEEN PRESENTED TO THE
> LRSD BOARD OF DIRECTORS AT A HEARING TOMORROW.  MS.
> VANDIVER HAS AGREED TO RESIGN HER POSITION WITH LRSD AND
> WILL SUBMIT AS SOON AS POSSIBLE TO BOARD PRESIDENT JUDY
> MAGNESS AND SUPERINTENDENT DR. KEN JAMES A LETTER OF
> RESIGNATION EFFECTIVE February 27, 2003.  LRSD AGREES TO
> CONTINUE HER SALARY FOR ONE MONTH BEYOND February 27, TO
> CONTINUE HER BENEFITS THROUGH THE END OF HER CURRENT
> CONTRACT (AS A PRACTICAL MATTER, June 30, 2003) AND TO
> PROVIDE HER A NEUTRAL REFERENCE (JOB TITLE AND DATES OF

---

[40]Exhibit 1, Vandiver Dep. p. 113, Defendants' Motion.

[41]Exhibit 8, James Letter 2, Defendants' Motion.

[42]Exhibit 1, Vandiver Dep. p. 126, Defendants' Motion.

[43]Exhibit 3, Medical Report, Plaintiff's Response.

[44]Exhibit 1, Vandiver Dep. p.131, Plaintiff's Response.

7

EMPLOYMENT).  PLEASE CONFIRM THIS AGREEMENT BY RETURN E-MAIL.  THA[]NKS FOR YOUR COOPERATION.[45]

Mr. Myers responded:

> Your e-mail (February 26, 2003 11:07 AM) fairly sets out the terms of our agreement.  Let me know if there is anything else that Ms. Vandiver needs to do to implement the agreement.  She will be in my office to sign the resignation form as soon as the roads thaw.[46]

A letter from Mr. Myers to Mr. Heller, dated March 5, 2003, states in pertinent part:

> Enclosed please find M[s]. Vandiver['s] resignation effective Thursday February 27, 2003 made pursuant to our February 26, 2003 agreement.  To reiterate, for personal reasons M[s]. Vandiver has agreed to resign from her teaching position with LRSD; she will be paid through March, 2003; she will remain on the LRSD insurance plan through the end of her current contract (June 30, 2003) and any job related reference will be neutral, stating only her dates of employment and that she resigned.[47]

Plaintiff asserts that she did not know anything about the agreements between the lawyers for her to resign in exchange for a continuation of salary and benefits.[48]  Plaintiff resigned effective on February 27, 2003.[49]  Plaintiff received her salary for a month beyond her resignation date and

---

[45]Exhibit 2, Attorney Communications, Plaintiff's Response.

[46]Exhibit 2, Attorney Communications, Plaintiff's Response.

[47]Exhibit 2, Attorney Communications, Plaintiff's Response.

[48]Exhibit 1, Vandiver Dep. p.136, Plaintiff's Response.

[49]Exhibit 11, Resignation Letter, Defendants' Motion.

benefits through the end of her contract.[50]  Plaintiff filed for bankruptcy on June 18, 2003.[51]  She did not list her claims against the Defendants as an asset in her bankruptcy forms.[52]

On July 24, 2003, Plaintiff filed her Charge of Discrimination with the EEOC.[53]  She received her right-to-sue letter on July 28, 2003.[54]  Plaintiff did not amend her bankruptcy petition to reflect her claims against the Defendants.[55]  Plaintiff received a discharge in her bankruptcy on September 30, 2003.[56]  Plaintiff's bankruptcy case was closed on October 6, 2003.[57]  Plaintiff filed her Complaint on October 21, 2003.  Plaintiff filed her Amended Complaint on April 2, 2004.  Plaintiff reopened her bankruptcy as of April 16, 2007, to amend her Chapter 7 Bankruptcy petition and schedules to reflect this action.[58]

On August 27, 2007, the Court issued an Order on Defendants' first Motion for Summary Judgment.  There, the Court found that the doctrine of judicial estoppel was not applicable in this case.  Additionally, the Court denied summary judgment on the basis of settlement and

---

[50]Exhibit 9, Agreement e-mail, Defendants' Motion; Exhibit 10, Cover Letter to Resignation Letter, Defendants' Motion; Exhibit 1, Vandiver Dep. p. 133, Defendants' Motion..

[51]Exhibit 1, Vandiver Dep. p. 140-41, Defendants' Motion; Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[52]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[53]Exhibit 13, EEOC Documents, Defendants' Motion.

[54]Exhibit 13, EEOC Documents, Defendants' Motion.

[55]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[56]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[57]Exhibit 12, Bankruptcy Filings, Defendants' Motion.

[58]Exhibit 6, Order Reopening Bankruptcy, Plaintiff's Response.

compromise, but allowed the parties to further brief the issue, and stated that, depending on the parties submissions, the Court may hold an evidentiary hearing on the issue.

The Court dismissed Plaintiff's Title VII and parallel Arkansas Civil Rights Act claims against Defendants Smith and Lacey in their individual capacities. The Court denied summary judgment as to Plaintiff's Title VII, Arkansas Civil Rights Act, and Title IX hostile work environment and quid pro quo sexual harassment claims, but stated that it would allow the parties to further brief the issues. The Court granted summary judgment as to Plaintiff's retaliation claim and her claim of negligent infliction of emotional distress, but denied summary judgment as to Plaintiff's section 1983 and parallel Arkansas Civil Rights Act claims and Plaintiff's intentional infliction of emotional distress due to Defendants' failure to address those claims.

## II. Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

10

[T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

**III.  Motion for Summary Judgment**

    **A.  Judicial Estoppel**

Defendants request that this Court reconsider its previous ruling on the judicial

estoppel issue in light of the fact that, although Plaintiff eventually reopened her bankruptcy case

to include her claims against these Defendants, she did so only after being forced to do so by

Defendants' Motion for Summary Judgment, which raised the issue of judicial estoppel.

Defendants state that in November and December of 2002, Plaintiff threatened to sue

Defendant Smith and asked witnesses to testify in her case against Smith.  Defendants further

state that in April of 2003, Plaintiff was advised by Dr. Richard Young, Superintendent of the

Brinkley School District, to wait until her criminal trial was over before suing Defendant Smith.

Defendants state that "Plaintiff was obviously planning to sue Smith at the time she filed her

bankruptcy petition," that the only reason she did not contact the EEOC before July of 2003 was

that her criminal trial was pending, and that Plaintiff began the process of filing a charge at the

EEOC the day after her criminal trial.

Defendants argue that this case is exactly on point with *De Leon v. Comcar Indus. Inc.*,

321 F.3d 1289 (11th Cir. 2003).  In *De Leon*, the plaintiff argued that his effort to reopen his

bankruptcy estate was evidence that his omission was inadvertent.  *Id*. at 1291.  The Eleventh

Circuit Court of Appeals rejected this argument noting that "the debtor's failure to satisfy its

statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge

of the undisclosed claims or has no motive for their concealment."  *Id*. (quoting *Burnes v. Pemco

Aeroplex, Inc.*, 291 F.3d 1282, 1288 (11th Cir. 2002) (quoting *In re Coastal Plains, Inc.*, 179

F.3d 197, 210 (5th Cir. 1999))).  The court stated that despite the debtor's continuing duty to

disclose all assets or potential assets to the bankruptcy court, he did not amend his bankruptcy

documents to add his claim until after the defendant relied on it in its motion to dismiss the case.

*Id*.

> The success of our bankruptcy laws requires a debtor's full honest disclosure.
> Allowing [plaintiff] to back-up, re-open the bankruptcy case, and amend his
> bankruptcy filings, only after his omission has been challenged by an adversary,
> suggests that a debtor should consider disclosing potential assets only if he is
> caught concealing them.

*Id*. (quoting *Burnes*, 291 F.3d at 1288).

However, as Plaintiff notes, unlike the plaintiff in *DeLeon*, Ms. Vandiver had not filed a

lawsuit prior to being discharged in bankruptcy.  Plaintiff further argues that her employment

claim was only potential throughout the entire bankruptcy proceedings, and no decision had been

made to "go through with an employment discrimination claim."

Previously, the Court declined to apply the doctrine of judicial estoppel stating:

> While the fact that the bankruptcy court granted Plaintiff a discharge without
> notice of her claims against Defendants arguably creates the appearance that the
> bankruptcy court was misled, on April 16, 2007, Plaintiff reopened her Chapter 7
> case to amend her petition and schedules to reflect this action.  Accordingly, the
> Court cannot find that either the bankruptcy court or this Court is being misled.
> *See Francis v. Arkansas Blue Cross and Blue Shield*, 2007 WL 1965393, *2 (July
> 2, 2007).  Finally, the Court cannot find that Plaintiff will derive an unfair
> advantage over Defendants if she is allowed to proceed with her employment
> discrimination claims.  Plaintiff asserts that her failure to amend her petition was
> not an attempt to manipulate the judicial system.  Rather, she simply did not
> realize that when considering a claim against LRSD, she needed to notify the
> bankruptcy court.  The bankruptcy court has now been advised of this lawsuit,
> albeit after the fact.  Furthermore, as in *Stallings*, there are no allegations that
> Defendants wrongdoing caused Plaintiff to file for bankruptcy or that they were
> her creditors.  *See Tiller v. Fluker*, 2007 WL 1488150, *7 (E.D. Ark. May 17,
> 2007) (denying summary judgment on the basis of estoppel on the same basis).

> The Court emphasizes that the Eighth Circuit has instructed, "Courts should only
> apply the doctrine as an extraordinary remedy when a party's inconsistent behavior

will result in a miscarriage of justice." *Stallings*, 447 F.3d at 1049. The Court finds the doctrine of judicial estoppel is not appropriate in this case.

Although this is a close question, the Court declines to reconsider its previous ruling. The Court agrees that the Eleventh Circuit would likely apply the doctrine of judicial estoppel on these facts. However, the Court is not persuaded that the Eighth Circuit would do so.

### B. Settlement

With regard to Defendants' argument that this action is barred by Plaintiff's previous settlement and compromise of her claims, the Court stated:

> Here, Defendants rely on the written communications between their counsel and Plaintiff's former counsel. In referencing the terms of the agreement, Defendants' counsel states that the agreement is to "resolve the issues which otherwise would have been presented to the LRSD Board of Directors at a hearing tomorrow." From the record currently before the Court, it does not appear that the "issues" that would have been presented to the LRSD Board would have included anything more than the factual bases for the recommendations by Dr. James that Plaintiff be terminated from her teaching position. Plaintiff's claims of sexual harassment by Defendant Smith are not mentioned in the communications.
>
> However, Plaintiff alleges that she sent Mr. Heller a letter raising her claims of sexual harassment in December of 2002, and that she complained to Defendant Lacey in November of 2002. And, it is reasonable to assume that she made her then attorney, Mr. Myers, aware of her sexual harassment claims. It is at least possible that the attorneys contemplated the settlement of all of Plaintiff's claims against the LRSD, including any claims of sexual harassment, through these communications. However, there is no evidence, by affidavit or otherwise, supporting such a contention.
>
> Based upon the present record, the Court must deny summary judgment on the basis of settlement and compromise. However, if Defendants still contend that Plaintiff's sexual harassment claims are barred by the agreement, they may submit further briefing on this issue, including affidavits of the attorneys who negotiated same, assumably Mr. Myer and Mr. Heller. Similarly, Plaintiff may submit further briefing to rebut the argument that her claims have been settled, including arguments regarding the authority of her attorney. If affidavits of the attorneys are submitted supporting the Defendants' contention that the settlement covered any potential sexual harassment claim, the Court will hold an evidentiary hearing, *see Gatz supra*, at which the parties can put on all relevant evidence, thus enabling the Court to resolve the issue.

In their supplemental motion, Defendants state that they are unable to secure an affidavit from Plaintiff's attorney due to a claim of attorney/client privilege, and an affidavit from Mr. Heller would merely create a fact question, and probably result in his disqualification from this case. Nevertheless, Defendants set forth the context in which they contend the settlement agreement was entered into, specifically the "agreement to resolve the issues which otherwise would have been presented to the LRSD Board of Directors at a hearing []."

Defendants state that the letters Dr. James sent to Plaintiff recommending her termination were sent in accordance with the Arkansas Teacher Fair Dismissal Act. Ark. Code Ann. § 6-17-1501, *et seq*. Plaintiff requested a hearing, at which she had the right to be represented and to request a full record at LRSD's expense. Ark. Code Ann. § 6-17-1509(c)(3) and (c)(4). Additionally, Defendants state that Plaintiff would have had the right to present and cross examine witnesses and to present evidence, and that she could have presented evidence that she should not be terminated because the termination recommendation was rooted in her rejection of Smith's improper sexual advances. Instead, she chose to resign.

Defendants argue that they have supported their summary judgment motion with evidence of the essential elements of a contract, and Plaintiff has the burden of proving lack of mutuality as a defense to enforcement of the agreement. Additionally, Defendants argue that Plaintiff's attorney acted with apparent authority to negotiate a settlement agreement on her behalf, and Plaintiff has the burden of proving lack of knowledge of the settlement negotiations. Defendants state that Plaintiff has the ability to waive the attorney/client privilege and present evidence that her attorney "kept her in the dark about settlement negotiations."

15

Plaintiff asserts that Defendants have failed to present evidence that a final agreement was agreed to by the parties, and that Defendants are improperly attempting to force Plaintiff to prove that a settlement agreement does not exist.  Plaintiff states that she has provided proof that a global settlement agreement was not reached through her testimony and through the lack of express language in the communications between the attorneys, and absent any countervailing evidence, she "does not have to go any further in her proof."  Finally, Plaintiff argues that since the existence of a settlement agreement is a question of fact, it is clear that there is a genuine issue of material fact in dispute as to whether Plaintiff's claim was previously settled.

As previously stated:

> "A district court has the inherent power to summarily enforce a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous."  *Gatz v. Southwest Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir. 1988).  "The district court must hold an evidentiary hearing, however, when there is a substantial factual dispute concerning the existence or terms of the settlement agreement, or when the situation presents complex factual issues."  *Id.* (internal citations omitted).

The agreement is not clear and unambiguous, but the Defendants still have not presented adequate proof to justify summary judgment on the settlement issue.[59]

---

[59]Assuming this defense is pursued at trial, the Court notes that the communications and representations made by the attorneys in their dealings concerning the terms of Plaintiff's resignation are not privileged.  They do not involve communications between Mr. Myers and his client, but rather communications by and between Mr. Myers and Mr. Heller.  And, depending on the testimony of the attorneys, the issue of apparent authority may arise.

**C.  Title VII Claim and Arkansas Civil Rights Act Claim**[60]

**1.  Merits of the Title VII and Arkansas Civil Rights Claim**s

As previously stated by the Court, Plaintiff alleges that she was subjected to a hostile

work environment and to quid pro quo harassment.  "Title VII [] prohibits both quid pro quo

harassment, where an employee's submission to or rejection of a supervisor's unwelcome sexual

advances is used as the basis for employment decisions, and hostile work environment

harassment, where 'the workplace is permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment.'"  *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903,

907-08 (8th Cir. 2006).  The Eighth Circuit has stated that "a claim of quid pro quo harassment

often adds little to a straightforward Title VII analysis."  *Henthorn v. Capitol Communications,*

*Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004).  "Both quid pro quo and hostile work environment

sexual harassment claims are grounded in the same legal theory under Title VII, the former

involving an explicit, and the latter a constructive, change in conditions of employment."  *Id.*

"Sexual harassment is quid pro quo if a tangible employment action follows the employee's

refusals to submit to a supervisor's sexual demands."  *Id.* at 1026-27.  "A plaintiff in that

situation need not prove that the offensive conduct is severe or pervasive because any carried-out

---

[60]Neither party argues that a different standard for deciding the merits of Plaintiff's
Arkansas Civil Rights Act (ACRA) claim applies.  "[T]he Arkansas Civil Rights Act expressly
instructs [the courts] to look to federal civil-rights law when interpreting the Act."  *Island v..*
*Buena Vista Resort,* 352 Ark. 548, 557 (2003) (sexual harassment claim).  Additionally, the
Arkansas Supreme Court has explained that Arkansas state courts may look to federal decisions
for persuasive authority when considering claims under the ACRA.  *Id.* at 556-57.  However, the
Court notes the arguments differentiating the ACRA and Title VII regarding the time-bar issue.

threat is itself deemed an actionable change in the terms or conditions of employment." *Id.* at 1027.

In reviewing Plaintiff's discrimination claim, the Court must bear in mind that summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005). Nonetheless, "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.*

To establish a prima facie case on her quid pro quo claim, Plaintiff must prove "(1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment." *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1006 n.8 (8th Cir. 2000).

Previously, the Court expressed its concern regarding the ability of Plaintiff to establish the fourth element of her prima facie case of quid pro quo harassment, which would require her to demonstrate that her refusal to submit *resulted* in a tangible job detriment. More specifically, the Court questioned whether Plaintiff could show that her alleged harasser, Defendant Smith, made the decision to terminate her, resulting in her resignation ,or that Defendant Smith possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer. Additionally, the Court had doubts regarding Plaintiff's ability to present proof that Dr. James had any knowledge of the alleged harassment, or that he based his decision to recommend the termination of Plaintiff upon anything other than the facts

set forth in his letters.  Finally, the Court questioned whether Plaintiff could demonstrate that

Defendant Smith had influence or leverage over the official decisionmaker, such that it would be

proper to impute his discriminatory attitude to the formal decisionmaker, or that Dr. James

merely acted as a rubber stamp or the cat's paw for Defendant Smith.

In their supplemental motion, Defendants set forth the deposition testimony of Dr. James

in support of their assertion that Plaintiff cannot demonstrate that her refusal to submit to the

alleged quid pro quo sexual harassment resulted in a tangible job detriment.  Dr. James testified

that he did not have a social relationship with Defendant Smith.  He further testified that

Defendant Smith reported to Marian Lacey, Marian Lacey reported to Sadie Mitchell, and Sadie

Mitchell reported to him.  Dr. James stated that Marian Lacey would have been charged with

investigating the allegations made by Plaintiff against Defendant Smith.  When asked if he issued

the termination letters because someone told him to, he clarified that "that comes down from HR

based upon the investigation and the allegations that are made," and "then if we feel . . . that

we've got substantial cause to move ahead, then we move ahead," and "on that basis, I then

generated those letters to [Ms. Vandiver]."  Dr. James also testified that he became aware of Ms.

Vandiver's allegations of sexual harassment only after Ms. Vandiver received the termination

recommendation letter.

Defendants argue that only the Little Rock School Board has the authority to terminate a

teacher pursuant to the Teacher Fair Dismissal Act.  Ark. Code. Ann. § 6-17-1504, *et seq*.

Defendants also argue that there is no evidence that Dr. James had any ill motives in

recommending Ms. Vandiver's termination, that he had any knowledge about Ms. Vandiver's

complaints against Smith, that he merely acted as a "rubber stamp" or "cat's paw" for Smith, or

that Smith had influence or leverage over Dr. James or the School Board.

Plaintiff argues that it was Plaintiff's understanding that Smith made the

recommendations to terminate, and thus, he had control over her employment status despite the

formalities of a Board hearing.  Plaintiff further argues that Smith initiated the termination and

provided all of the information as to why Plaintiff should be terminated.  Plaintiff asserts that she

is unaware of any investigation, as she was never interviewed, and even if an "investigation"

took place, the fact that she was never interviewed supports her assertion that it was a "sham."

Plaintiff asserts that Defendants have failed to establish that the School Board is more than just a

rubber stamp to Smith's decisions, and therefore, a jury could reasonably infer that Smith was the

actual decisionmaker.

As previously noted by the Court, in *Hill v. Lockheed Martin Logistics Management, Inc.*,

354 F.3d 277, 296 (4th Cir. 2004), the Fourth Circuit discussed liability of employers in the Title

VII and ADA context stating:

> Nor would it be appropriate to withhold summary judgment from an employer
> who has terminated an employee for rules violations, and wholly in the absence of
> any discriminatory motivation on the part of the decisionmakers, simply because
> the violations might not have been known in the absence of a subordinate's
> discriminatory animus that brought the infractions to light.  Otherwise, an
> unbiased employer could never discipline or terminate an employee for an
> undisputed violation of company rules, including such egregious acts as fighting
> or stealing (or endangering the lives of those who fly on aircraft carelessly
> attended by a mechanic), so long as the employee could demonstrate that she was
> "turned in" by a subordinate employee "because of" a discriminatory motivation.

Here, Defendant Smith initially recommended Ms. Vandiver's termination to Dr. James.

Dr. James then made the decision to recommend termination to the Little Rock School Board.

The Little Rock School Board never had the opportunity to decide whether to terminate Ms.

Vandiver because she resigned prior to her hearing.  Importantly, Plaintiff does not dispute that the facts cited in Dr. James' termination recommendation letters as the basis for her termination are true.  Furthermore, Plaintiff does not assert that Dr. James had any discriminatory motivation for recommending her termination, or any knowledge of the alleged harassment by Smith.

The undisputed facts underlying the termination recommendation establish ample cause for such a recommendation, even assuming that those facts were reported only because of Plaintiff's refusal to submit to the alleged advances by Smith.  Plaintiff has not established the fourth causal element of her prima facie case.  Summary judgment is granted as to Plaintiff's Title VII and Arkansas Civil Rights Act quid pro quo sexual harassment claims.

Plaintiff also alleges that she was subjected to a hostile work environment.  However, as discussed by the Court in its previous Order, because Plaintiff's resignation was not causally related to the alleged quid pro quo sexual harassment, it is not an occurrence of discrimination.  Therefore, the last act related to the harassment occurred on December 9, 2002, and Plaintiff's Title VII hostile work environment claim is time barred.

However, Plaintiff's hostile work environment claim is not precluded under the Arkansas Civil Rights Act of 1993, which states:

> The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> (1) The right to obtain and hold employment without discrimination;
> . . .
> Any action based upon employment discrimination . . . shall be brought within one (1) year after the alleged employment discrimination occurred, or within ninety days of receipt of a "Right to Sue" letter or a notice of "Determination" from the United States Equal Employment Opportunity Commission concerning the alleged unlawful employment practice, whichever is later.

Ark. Code Ann. § 16-123-107(a)(1) and (c)(3) (1993). *See also Island v. Buena Vista Resort*, 352 Ark. 548, 559, 103 S.W.3d 671, 677 (2003) (finding that the Arkansas Civil Rights Act is applicable to workplace sexual harassment). Additionally, the Court previously found that "Plaintiff's factual allegations and her deposition testimony clearly set out an egregious prima facie case of hostile work environment sexual harassment by her supervisor." Defendants do not ask the Court to reconsider this issue. It is for the jury to determine whether Plaintiff's allegations are true. Therefore, Plaintiff's Arkansas Civil Rights Act hostile work environment claim will proceed to trial.

### D.  Title IX Claim

Plaintiff also asserts a private cause of action under Title IX based upon the alleged sexual harassment. As the Court has found that summary judgment is not appropriate as to Plaintiff's Arkansas Civil Rights Act hostile work environment claim and Plaintiff's hostile work environment claim under Title VII was only time-barred under Title VII, arguably, Plaintiff's hostile work environment claim would survive under Title IX, if a private right of action exists. Therefore, the Court must decide whether Plaintiff can assert a private cause of action under Title IX based upon those allegations.

The Eighth Circuit has remarked that "to the degree [a plaintiff] relies upon teaching conditions, such as course assignments," a Title IX claim "merely duplicates" a Title VII claim. *Brine v. Univ. of Iowa,* 90 F.3d 271, 276 (8th Cir. 1996) (quoting *O'Connor v. Peru State College,* 781 F.2d 632, 642 n. 8 (8th Cir. 1986)). In *Brine*, the Eighth Circuit stated:

> Other circuits have explicitly declared that for employment discrimination cases, "the Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX." *Lipsett v. University of Puerto Rico,* 864 F.2d 881,

896 (1st Cir.1988); *see also Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 206-07 (4th Cir.1994), and *Mabry v. State Board of Community Colleges and Occupational Education,* 813 F.2d 311, 316-17 n. 6 (10th Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). We are persuaded by those opinions and therefore uphold the trial court's action.

*Id.*

As previously stated by the Court in its Order, in *Cooper v. Gustavus Adolphus College,* 957 F. Supp. 191, 192 n.1 (D. Minn. 1997), the district court noted that the Eighth Circuit has been presented with a claim for damages for employment discrimination under Title IX. (citing *O'Connor v. Peru State College,* 781 F.2d 632 (8th Cir. 1986)). "However, that decision did not determine whether such a claim is generally cognizable, because it was dismissed on the grounds that the employee, an athletic coach, did not work for a federally funded program." *Id.* Therefore, the Eighth Circuit has not addressed the issue of whether a private right of action exists under Title IX. *Id.* at 193 n.2 (citing *Brine v. Univ. of Iowa,* 90 F.3d 271, 276 (8th Cir.1996) (university did not "challenge the proposition that a private right of action exists under Title IX")).

In *Cooper*, the district court stated:

Title IX prohibits sex discrimination on the part of educational programs that receive federal funds. The remedy for discrimination explicitly set forth in the statute is the denial of federal funding. *Id.* The courts have recognized an implied cause of action on behalf of students and prospective students who are discriminated against in education. *Franklin v. Gwinnett County, Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992); *Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994). Furthermore, a lawsuit under Title IX may challenge the validity of administrative regulations terminating federal funding of an educational institution that discriminated on the basis of sex in employment

practices. *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) ("Bell").

However, most courts have rejected the theory that employees of an educational institution have an implied cause of action for damages under Title IX. *Lakoski v. James,* 66 F.3d 751, 754 (5th Cir.1995); *Howard v. Bd. of Educ. Sycamore Community Unit,* 893 F. Supp.808, 815 (N.D. Ill. 1995); *Wedding v. Univ. of Toledo,* 862 F.Supp. 201, 203-04 (N.D. Ohio 1994); *Storey v. Bd.* of Regents, 604 F. Supp. 1200, 1205 (W.D. Wis. 1985). These courts have all reached the conclusion that since Title VII provides a comprehensive and carefully balanced remedial mechanism for redressing employment discrimination, and since Title IX does not clearly imply a private cause of action for damages for employment discrimination, none should be created by the courts.

*Id*. at 192-93. The court rejected *Henschke v. New York Hospital-Cornell Medical Ctr.,* 821 F. Supp. 166, 172 (S.D.N.Y. 1993), determining that it failed to appropriately consider the impact of the existence of Title VII remedies for employment discrimination. *Id.* at 193. Instead, the court concluded that "there is no private action for damages available to a college employee under Title IX for sex discrimination." *Id.*

However, in *Bedard v. Roger Williams University,* 989 F. Supp. 94, 97 -98 (D.R.I. 1997), the district court stated, "this court agrees with those courts which predictively view the Supreme Court's 'next logical step' as being to recognize a private cause of action under Title IX for employment discrimination against a federally funded education program." (citing *Bowers v. Baylor Univ.,* 862 F. Supp. 142, 145 (W.D. Tex. 1994); *Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 205- 06 (4th Cir. 1994); *Nelson v. Univ. of Maine Sys.,* 923 F. Supp. 275, 278-79 (D. Me. 1996)). However, the court recognized that "other courts have argued that to read a private cause of action for employment discrimination into Title IX would disrupt the 'carefully balanced remedial scheme for redressing' such grievances as

mandated by Congress through Title VII." *Id*. (citing *Lakoski v. James,* 66 F.3d 751, 754 (5th

Cir. 1995); *Cooper v. Gustavus Adolphus College,* 957 F.Supp. 191, 193 (D. Minn.1997);

*Howard v. Bd. of Educ. of Sycamore Community Unit Sch. Dist.,* 893 F.Supp. 808, 815 (N.D. Ill.

1995); *Wedding v. Univ. of Toledo,* 862 F.Supp. 201, 203-04 (N.D. Ohio 1994)).

In *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-75, 125 S.Ct. 1497, 1503-05

(2005), the Supreme Court stated:

> Title IX prohibits sex discrimination by recipients of federal education funding.
> The statute provides that "[n]o person in the United States shall, on the basis of
> sex, be excluded from participation in, be denied the benefits of, or be subjected
> to discrimination under any education program or activity receiving Federal
> financial assistance." 20 U.S.C. § 1681(a). More than 25 years ago, in *Cannon v.
> University of Chicago,* 441 U.S. 677, 690-693, 99 S.Ct. 1946, 60 L.Ed.2d 560
> (1979), we held that Title IX implies a private right of action to enforce its
> prohibition on intentional sex discrimination. In subsequent cases, we have
> defined the contours of that right of action. In *Franklin v. Gwinnett County Public
> Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), we held that it
> authorizes private parties to seek monetary damages for intentional violations of
> Title IX. We have also held that the private right of action encompasses
> intentional sex discrimination in the form of a recipient's deliberate indifference to
> a teacher's sexual harassment of a student, *Gebser v. Lago Vista Independent
> School Dist.,* 524 U.S. 274, 290-291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), or
> to sexual harassment of a student by another student, *Davis v. Monroe County Bd.
> of Ed.,* 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).
>
> In all of these cases, we relied on the text of Title IX, which, subject to a list of
> narrow exceptions not at issue here, broadly prohibits a funding recipient from
> subjecting any person to "discrimination" "on the basis of sex." 20 U.S.C. § 1681.
> Retaliation against a person because that person has complained of sex
> discrimination is another form of intentional sex discrimination encompassed by
> Title IX's private cause of action. Retaliation is, by definition, an intentional act. It
> is a form of " discrimination" because the complainant is being subjected to
> differential treatment. *See generally Olmstead v. L. C.,* 527 U.S. 581, 614, 119
> S.Ct. 2176, 144 L.Ed.2d 540 (1999) (KENNEDY, J., concurring in judgment) (the
> "normal definition of discrimination" is "differential treatment"); *see also
> Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, n. 22,
> 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (discrimination means "less favorable"
> treatment). Moreover, retaliation is discrimination "on the basis of sex" because it

is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

The Court of Appeals' conclusion that Title IX does not prohibit retaliation because the "statute makes no mention of retaliation," 309 F.3d, at 1344, ignores the import of our repeated holdings construing "discrimination" under Title IX broadly. Though the statute does not mention sexual harassment, we have held that sexual harassment is intentional discrimination encompassed by Title IX's private right of action. *Franklin,* 503 U.S., at 74-75, 112 S.Ct. 1028; see also *id.,* at 75, 112 S.Ct. 1028 (noting that, under *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), " 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex,' " and holding that "the same rule should apply when a teacher sexually harasses ... a student"). Thus, a recipient's deliberate indifference to a teacher's sexual harassment of a student also "violate[s] Title IX's plain terms." *Davis, supra,* at 643, 119 S.Ct. 1661 (citing *Gebser, supra,* at 290-291, 118 S.Ct. 1989). Likewise, a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes "discrimination" "on the basis of sex." *Davis,* 526 U.S., at 643, 119 S.Ct. 1661; see also *id.,* at 650, 119 S.Ct. 1661 ("Having previously determined that 'sexual harassment' is 'discrimination' ... under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute"). "Discrimination" is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach. See *North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (Courts " 'must accord' " Title IX " 'a sweep as broad as its language' ").

In *Jackson*, the Court concluded that Title IX's private right of action encompassed a claim of

retaliation brought by a former coach of a girls' high school basketball team who advocated for

the rights of the team.  *Id*. at 178, 125 S.Ct. at 1507.  The underlying discrimination was

perpetrated against students, not the employee.  The Court noted that "teachers and coaches such

as Jackson are often in the best position to *vindicate the rights of their students* because they are

better able to identify discrimination and bring it to the attention of administrators." *Id*. at 181, 125 S.Ct. at 1508 (emphasis added).

Plaintiff argues that the Supreme Court has held that employment discrimination is covered by Title IX, citing *North Haven Bd. of Education v. Bell*, 456 U.S. 512, 530 (1982). However, *Bell* only addressed "Title IX's prohibition of employment discrimination in a challenge to the validity of administrative regulations terminating federal funding of educational institutions that discriminated on the basis of sex in their employment practices." *Lakoski*, 66 F.3d at 754. "*Bell* was not a claim by an individual for money damages for discrimination." *Id*. "In *Bell*, unlike here, a private remedy for aggrieved employees under Title VII did not affect, much less undermine, the validity of regulations for terminating federal funding." *Id*. Therefore, *Bell* is not controlling on this issue.

While the Court previously stated that it was inclined to find a private right of action exists under Title IX in this case based upon the Supreme Court's broad construction of "discrimination" under Title IX, after further consideration, the Court finds that no such private right of action exists under Title IX. The Court is not persuaded that "Congress intended that Title IX offer a bypass of the remedial process of Title VII." *Lakoski,* 66 F.3d at 754. Furthermore, the Court agrees with Defendants' assertion that *Jackson* should not be read to expand private rights of action under Title IX to include claims of employment discrimination which have no connection to the rights of students, as the Supreme Court's seminal cases regarding Title IX private rights of action relate to claims by students against funding recipients. *See Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Ind. Sch. Dist*., 524 U.S. 274 (1998); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992);

27

*Cannon v. Univ. Of Chicago*, 441 U.S. 677 (1979).  Therefore, summary judgment is granted as

to Plaintiff's Title IX claims.

### E.  Section 1983 and Parallel Arkansas Civil Rights Act Claims

Plaintiff alleges a violation of 42 U.S.C. § 1983.  Plaintiff also alleges a parallel cause of

action under the Arkansas Civil Rights Act, which provides:

> a) Every person who, under color of any statute, ordinance, regulation, custom, or
> usage of this state or any of its political subdivisions subjects, or causes to be
> subjected, any person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Arkansas Constitution shall be
> liable to the party injured in an action in circuit court for legal and equitable relief
> or other proper redress.
> . . .
> (c) When construing this section, a court may look for guidance to state and
> federal decisions interpreting the federal Civil Rights Act of 1871, as amended
> and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which decisions
> and act shall have persuasive authority only.

Ark. Code Ann. § 16-123-105.  Deprivation of a right secured by Title VII by one acting under

color of state law constitutes grounds for a section 1983 claim.  *Morrow v. City of Jacksonville*,

941 F. Supp. 816, 826 (E.D. Ark. 1996).

Defendants argue that because Plaintiff's quid pro quo Title VII claim fails as a matter of

law, her parallel section 1983 claim should fail.  However, Defendants fail to recognize that

Plaintiff's hostile work environment claim under Title VII was only time barred, and survives

under the Arkansas Civil Rights Act on the merits.  Therefore, Plaintiff's section 1983 and

parallel Arkansas Civil Rights Act claims survive on the basis of the allegations of hostile work

environment.

Defendants argue that Defendants Lacey and LRSD are entitled to summary judgment on all claims under section 1983 because respondeat superior is not recognized as a basis for liability under the Section.[61]  *Keeper v. King*, 130 F.3d 1309 (8th Cir. 1997) ("It is well settled that 'respondeat superior is not a basis for liability under 42 U.S.C. § 1983.'").  Previously, the Court found that Defendants Lacey and LRSD were entitled to summary judgment on all claims under section 1983.  While Plaintiff recognizes that LRSD cannot be held liable under section 1983, Plaintiff requests that the Court "reconsider dismissing the claims against individual defendants [Smith and Lacey] and reinstate them in the lawsuit solely for purposes of the Section 1983 claim."  The Court did not dismiss Plaintiff's section 1983 claims against Defendant Smith, and Defendants do not seek dismissal against Defendant Smith on a respondeat superior basis.  Thus, Plaintiff's section 1983 claim against Separate Defendant Smith will proceed to trial.

As to Defendant Lacey, "supervisors in this position are liable under § 1983 for a subordinate's violation of a third person's constitutional right only if their deliberate indifference to the offensive conduct and failure to take adequate remedial action proximately caused the injury."  *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007) (citing *Ottman v. City of Independence, Mo.,* 341 F.3d 751, 761 (8th Cir. 2003); *Larson by Larson v. Miller,* 76 F.3d 1446, 1453 (8th Cir. 1996) (en banc)).  "Deliberate indifference is a 'stringent standard of fault.'"

---

[61]Defendants argue that Defendants Lacey and LRSD are entitled to summary judgment on all claims under the Arkansas Civil Rights Act because there is no respondeat superior under the Act.  Defendants cite *Jones v. Huckabee*, 369 Ark. 42, -- S.W.3d -- (2007), which states, "the doctrine of *respondeat superior* is not the basis for liability under the federal Civil Rights Act, codified at 42 U.S.C. § 1983, Ark. Code Ann. §§ 16-123-101 through 16-123-108."  While Ark. Code Ann. § 16-123-107, the parallel Title VII statute, is encompassed in the broad citation given by the Court, it is clear that the Court was only construing the Act as it relates to the parallel section 1983 statute, Ark. Code Ann. § 16-123-105.

*Id.* (citing *Shrum,* 249 F.3d at 780, citing *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).  "It requires proof of *reckless disregard* of a risk of constitutional harm."  *Id.* (citing *Pietrafeso v. Lawrence County,* 452 F.3d 978, 982-83 (8th Cir. 2006)).  "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see."  *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003).  In light of Plaintiff's allegation that she reported Defendant Smith's harassment to Defendant Lacey, yet the harassment continued, the Court agrees that Defendant Lacey may be liable under section 1983 .  Plaintiff may proceed against both Defendants Smith and Lacey on her section 1983 and parallel Arkansas Civil Rights Act claims.

### F.  Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim of intentional infliction of emotional distress, or outrage.  In *Island v. Buena Vista Resort*, 352 Ark. 548, 565, 103 S.W.3d 671, 680-81 (2003), the Arkansas Supreme Court stated:

> We have recognized a cause of action for the tort of outrage in an employment setting.  *See M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980).  We have explained that liability [for the tort of outrage] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  *Palmer, supra.* (*Citing the Restatement (Second) of Torts* § 46 Cmt. d (1965)).

> There are four elements that are necessary to establish liability for the tort of outrage: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Faulkner v. Arkansas Children's Hosp.,* 347 Ark. 941, 69 S.W.3d 393 (2002).

Plaintiff mistakenly states that "[t]he Court has already addressed the Infliction of Emotional Distress Claim in its previous order and granted Summary Judgment for Defendants on this claim."  In its previous Order, the Court granted summary judgment as to Plaintiff's claim for negligent infliction of emotional distress, but clearly stated that "Plaintiff's claim of intentional infliction of emotional distress, or outrage, will proceed."

Defendants argue that Defendants Lacey and LRSD are entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress because Plaintiff cannot prove respondeat superior, and Plaintiff has not alleged any act by Lacey or LRSD which would rise to the level of intentional infliction of emotional distress.  *See Porter v. Harshfield*, 329 Ark. 130, 948 S.W.2d 83 (1997).  The Court agrees.  However, Plaintiff's outrage claim may proceed against Defendant Smith.

## CONCLUSION

The Court declines to reconsider its denial of summary judgment because the application of the doctrine of judicial estoppel is not appropriate in this case.  Furthermore, the Court cannot grant summary judgment on the basis of settlement because, on the summary judgment record, the agreement is ambiguous. Summary judgment is granted as to Plaintiff's Title VII and Arkansas Civil Rights Act quid pro quo sexual harassment claims because Plaintiff has not established the fourth causal element of her prima facie case.  As a result of this ruling, the Court must find that summary judgment is appropriate as to Plaintiff's Title VII hostile work environment claim because it is time barred.  However, Plaintiff's Arkansas Civil Rights Act hostile work environment claim survives summary judgment as to LRSD.

Additionally, the Court finds that no private right of action exists under Title IX under the facts of this case, as *Jackson* should not be read to expand private rights of action under Title IX to include claims of employment discrimination which have no connection to the rights of students.  Therefore, summary judgment is granted as to Plaintiff's Title IX claims.  As to Plaintiff's section 1983 and parallel Arkansas Civil Rights Act claims, the Court upholds the previous grant of summary judgment in favor of LRSD, but finds that Plaintiff may proceed against both Defendants Smith and Lacey on said claims.  Finally, summary judgment is granted on Plaintiff's outrage claim as to Defendants LRSD and Lacey, but will proceed against Defendant Smith.

Accordingly,

IT IS THEREFORE ORDERED that Defendants' Supplemental Motion for Summary Judgment (Docket No. 102) be, and it is hereby, GRANTED in part, and DENIED in part as set forth above.

IT IS SO ORDERED this 9th day of October, 2007.

/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE